No. 87,519

STATE OF KANSAS, *Appellee,* v. SHAWNDELL MAYS, *Appellant.*
(85 P.3d 1208)

Opinion filed March 19, 2004.

*Michael G. Highland,* of Bonner Springs, argued the cause and was on the brief for appellant. *Shawndell Mays,* appellant, was on a supplemental brief pro se.

*Jerome A. Gorman,* assistant district attorney, argued the cause, and *Nick A. Tomasic,* district attorney, and *Phill Kline,* attorney general, were with him on the brief for appellee.

The opinion was delivered by

LUCKERT, J.: Shawndell Mays appeals from his convictions and sentences for two counts of first-degree murder, two counts of attempted first-degree murder, two counts of criminal possession of a firearm by a juvenile, and one count of conspiracy to commit first-degree murder. Mays was sentenced to a controlling term of two consecutive life sentences.

On direct appeal to this court, Mays raises eight issues in his brief filed by counsel: (1) Was the juvenile court's decision to authorize prosecution as an adult supported by substantial evidence? (2) Did the juvenile court proceeding used to authorize prosecution as an adult violate *Apprendi v. New Jersey,* 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000), and *State v. Gould,* 271 Kan. 394, 23 P.3d 801 (2001)? (3) Did the delay between Mays' arrest and preliminary hearing violate his right to a speedy trial? (4) Did the more than 8-month delay between Mays' arraignment and trial violate his right to a speedy trial? (5) Did the trial court err in failing to suppress evidence of Mays' statement to police because Mays was incompetent to waive his *Miranda* rights? (6) Did the doctor's testimony regarding the proximate cause of a victim's death negate a necessary element of Mays' conviction of first-degree murder? (7) Did the trial court err in instructing the jury? and (8) Did cumulative error deny Mays a fair trial? In his supplemental brief filed pro se, Mays raises four issues: (1) Did the trial court err in denying Mays' motion for severance? (2) Did the trial court err in denying Mays' motion to suppress his statement to

police? (3) Did the trial court err in admitting into evidence the codefendants' redacted statements? and (4) Did the trial court err in admitting a codefendant's statement because it was inadmissible as to Mays and violated his right to confront witnesses?

We affirm his convictions and sentences.

This case involved two separate drive-by shootings in January 2000. The first occurred on the night of January 24, 2000. According to the testimony of Marcus Quinn, he and Joseph Morton were sitting and talking in a car parked in an empty lot across the street from Quinn's home near 20th Street and Longwood in Kansas City, Kansas. While sitting there, Quinn saw a red truck. About 30 minutes later, Quinn saw the same red truck followed by a car. This time the truck stopped and its occupants shot multiple times at the Chevrolet Caprice in which Morton and Quinn were sitting. Quinn testified that the right side of his head was grazed, but he was not seriously injured. Morton ran away from the scene, but later died at a hospital. The second shooting occurred on the afternoon of January 26, 2000. Christopher Union and Lee Brooks were driving a white pickup truck near 30th and Spring when gunshots were fired at the truck. Both Brooks and Union were injured; Union died from his injuries.

The police investigation of the two shooting incidents eventually led to the custodial interrogations of Michael White, Shawndell Mays, Keith Mays, Peter Davis, and Carvell England on January 27, 2000. (Shawndell Mays will be referred to throughout this opinion as Mays; Keith Mays will be referred to by first and last name.) All of them talked to the investigators, describing the events of the two shootings to various degrees, with Mays and White admitting to firing shots during both incidents and all of them admitting to being a witness to one or both occurrences. Mays was 16 years old at the time of the shootings; he turned age 17 on January 29, 3 days after the second shooting.

In the same information, the State charged White, Mays, Davis, Keith Mays, and England with various charges relating to the shootings on January 24, January 26, or both. Three of the codefendants, including Mays, were juveniles. The court authorized the State to prosecute the three as adults pursuant to K.S.A. 38-

1636(a)(2). The five codefendants' joint trial lasted nearly 3 weeks, during which 39 witnesses testified. The redacted statements of each of the five codefendants were played for the jury over defense counsels' objections. Generally, all of the codefendants denied the allegations and, through cross-examination of the State's witnesses, sought to create reasonable doubt. Each codefendant also generally relied upon a self-defense theory.

The jury convicted Mays of two counts of first-degree murder, two counts of attempted first-degree murder, two counts of criminal possession of a firearm by a juvenile, and one count of conspiracy to commit first-degree murder. The jury also convicted Davis and White of various charges but acquitted Keith Mays and England of all charges.

This court affirmed the convictions of two codefendants in *State v. White*, 275 Kan. 580, 67 P.3d 138 (2003), and *State v. Davis*, 277 Kan. 231, 83 P.3d 182 (2004).

### *Was the Juvenile Court's Decision to Authorize Prosecution as an Adult Supported by Substantial Evidence?*

In stating his first issue on appeal, Mays recognizes that an appellate court reviews the district court's decision to allow the State to prosecute a juvenile as an adult to determine if the decision is supported by substantial evidence. *State v. Jones*, 273 Kan. 756, Syl. ¶ 2, 47 P.3d 783, *cert. denied* 537 U.S. 980 (2002). As we explained in *Jones*:

"Substantial evidence is evidence which possesses both relevance and substance and which furnishes a substantial basis of fact from which the issues can reasonably be resolved. It is not for this court to reweigh the evidence, substitute its evaluation of the evidence for that of the trial court, or pass upon the credibility of the witnesses." 273 Kan. 756, Syl. ¶ 2.

Our review of whether there was substantial competent evidence to support the district court's decision must be based upon the standards and procedures delineated in K.S.A. 38-1636 which, in turn, governed the district court's consideration of the State's motion to prosecute Mays as an adult. A court considering or reviewing such a motion must determine which statutory presumption created by K.S.A. 38-1636(a) applies. K.S.A. 38-1636(a)(1) pro-

vides that the "respondent shall be presumed to be a juvenile unless good cause is shown to prosecute the respondent as an adult." However, if the exceptions specified in K.S.A. 38-1636(a)(2) apply, the "respondent shall be presumed to be an adult." In this case, the district court correctly found that both exceptions applied to the prosecution of Mays. First, because Mays was "14, 15, 16 or 17 years of age at the time of the offense or offenses alleged in the complaint" and the charged offenses were crimes which, "if committed by an adult, would constitute" offgrid or person felonies, the exception stated in K.S.A. 38-1636(a)(2)(A)(i) applied. Second, because Mays was "14, 15, 16 or 17 years of age at the time of the offense or offenses alleged in the complaint" and the crime was "committed while in possession of a firearm," the exception stated in K.S.A. 38-1636(a)(2)(A)(ii) applied.

Because there was a presumption that Mays was an adult, the burden of proof was upon Mays to rebut the presumption. K.S.A. 38-1636(a)(2).

Even where the presumption is that the accused is an adult, the factors listed in K.S.A. 38-1636(e) must be considered. *State v. Medrano*, 271 Kan. 504, 507, 23 P.3d 836 (2001). Those factors are:

"(1) The seriousness of the alleged offense and whether the protection of the community requires prosecution as an adult or designating the proceeding as an extended jurisdiction juvenile prosecution; (2) whether the alleged offense was committed in an aggressive, violent, premeditated or willful manner; (3) whether the offense was against a person or against property. Greater weight shall be given to offenses against persons, especially if personal injury resulted; (4) the number of alleged offenses unadjudicated and pending against the respondent; (5) the previous history of the respondent, including whether the respondent had been adjudicated a juvenile offender under this code and, if so, whether the offenses were against persons or property, and any other previous history of antisocial behavior or patterns of physical violence; (6) the sophistication or maturity of the respondent as determined by consideration of the respondent's home, environment, emotional attitude, pattern of living or desire to be treated as an adult; (7) whether there are facilities or programs available to the court which are likely to rehabilitate the respondent prior to the expiration of the court's jurisdiction under this code; and (8) whether the interests of the respondent or of the community would be better served by criminal prosecution or extended jurisdiction juvenile prosecution." K.S.A. 38-1636(e).

At the hearing, after the judge announced that the burden was on Mays and the two other juveniles to show why they should not be prosecuted as adults, Mays and the other juveniles presented evidence. Mays' mother testified that he had experienced difficulty in coping with the shooting death of a 10-year-old cousin which he had witnessed. She indicated his family was unable to obtain counseling or other assistance for Mays other than what those programs provided at a neighborhood center. Jean Bridgewater, the center's minister and director, testified that Mays was a "fairly decent kid" and a follower, and "we could have an effect on him and work with him." Additionally, evidence was presented regarding the programs and facilities in the juvenile justice system. Testimony established that Mays had never been adjudicated as a juvenile offender or had access to any of the programs available in the juvenile justice system; that, if Mays were sentenced as a juvenile offender rather than an adult, he would likely remain in custody until he was 22 and ½ years old; and that his mother and others thought he would benefit from the programs available in the juvenile justice system.

At the conclusion of the evidence presented by the three juveniles, the prosecutor moved for a directed verdict arguing that the juveniles had failed to rebut the presumption that they should be tried as adults. After hearing arguments but no additional evidence, the district court found that all three juveniles had failed to rebut the presumption that they should be prosecuted as adults. The judge made the following findings with regard to the factors listed in K.S.A. 38-1636:

"[T]he first three are matters that are . . . clearly in this case, in terms of the seriousness of the offense, whether or not violence was used, and whether it was a person offense . . . those are clearly factors which, from what's before me, are in concert with the presumption that exists. Let me address, for a moment, the issues of factors four and five regarding previous offenses and unadjudicated pending offenses. I find that, with regard to Shawndell Mays, that there are none. . . . With regard to the issue of sophistication, as I have read the cases that have addressed that particular factor, they have to do with whether or not the individual is less or more sophisticated than a person his age. And . . . I'm not convinced that any of them are, in level of sophistication, different from people who are generally of their . . . respective ages. With regard to issue number seven, I suppose that's what I've heard most of the evidence about; and I've heard

lots of evidence about what's available, and what has been done, and what hasn't been done. But the factor, as set forth in the statute, that I'm to consider is whether there are facilities or programs available to the court which are likely to rehabilitate the respondent prior to the expiration of the court's jurisdiction under this code; and I have absolutely no evidence, a dearth of evidence on that issue as to the likelihood of rehabilitation. There . . . is no evidence. I'm not suggesting that there . . . could have been. . . . I don't know that there is any evidence . . . of likely rehabilitation, but that's the language of the standard. And finally, the issue of . . . whether . . . the respondent or the community would be better served by a criminal justice prosecution . . . . I have no difficulty in finding, from what I've heard today, that there is not evidence which rebuts the presumption established by the Legislature that [the juveniles]—in the cases that are before me today—should, in fact, be determined to be adults for the purpose of prosecution in those cases; and the Court so finds."

In his brief, Mays argues that the district court's decision to authorize his prosecution as an adult was not supported by substantial evidence because the State presented no evidence and relied solely on the complaint. In support of this argument, Mays cites *State v. Stephens*, 266 Kan. 886, 975 P.2d 801 (1999). In *Stephens*, this court reviewed a district court's decision to authorize prosecution of a 17-year-old as an adult. The version of K.S.A. 38-1636 in effect at the time of Stephens' hearing required the State to present substantial evidence supporting his prosecution as an adult. See K.S.A. 38-1636 (Furse 1993). Mays was authorized for prosecution as an adult pursuant to K.S.A. 38-1636(a)(2), which places the burden on the respondent to rebut the presumption that he is an adult. Thus, the analysis in *Stephens* is not applicable.

Furthermore, the holding in *Stephens* does not support Mays' argument. In *Stephens*, the district court reviewed each of the eight factors set out at K.S.A. 38-1636(e). As to factor (8), which requires the court to consider whether the interests of the respondent or of the community would be better served by criminal prosecution, the district judge made the following conclusory finding:

" 'There's a strong interest in this community to be able to feel safe and if nowhere else certainly in your own home. There's a strong interest in this community that juveniles should be held accountable for their actions, and when juveniles who have the necessary intellect make adult decisions they should receive adult consequences. I see both of the Respondents in this matter had a choice back in November as to what it is they wanted to do.' " *Stephens*, 266 Kan. at 891.

Noting that the district court had failed to discuss whether the respondents' interests would be served by criminal prosecution, although reference was made to the community, this court found there was not substantial evidence in favor of adult prosecution as to factor (8). 266 Kan. at 892. It is upon this conclusion which Mays relies.

However, the *Stephens* court held that, despite the lack of substantial competent evidence as to factor (8), the record as a whole reflected substantial evidence to show that Stephens was properly prosecuted as an adult. 266 Kan. at 892. This holding follows from K.S.A. 38-1636(e), which provides: "The insufficiency of evidence pertaining to any one or more of the factors listed in this subsection, in and of itself, shall not be determinative of the issue."

Similarly, in this case, insufficiency of evidence as to one or more factors does not, of itself, defeat the district court's conclusion that Mays failed to rebut the presumption that he should be tried as an adult. Clearly, the district court weighed each factor of K.S.A. 38-1636(e). We conclude that the court's decision to try Mays as an adult was supported by substantial evidence.

### *Did the Juvenile Court Proceeding Used to Authorize Prosecution as an Adult Violate Apprendi and Gould?*

Next, Mays argues that the juvenile court proceeding used to authorize his prosecution as an adult violated the principles set out in *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000), and *State v. Gould*, 271 Kan. 394, 23 P.3d 801 (2001), because it resulted in an increased sentence based upon facts not submitted to a jury or proved beyond a reasonable doubt. Mays acknowledges that his argument was rejected by this court in *Jones*, 273 Kan. at 777-78, but raises the issue to preserve it for future review in the federal courts.

The *Jones* court held that "the Kansas procedure for authorizing adult prosecution under K.S.A. 38-1636 does not violate the Sixth and Fourteenth Amendments to the United States Constitution." 273 Kan. at 778. The court explained that while *Apprendi* involved a trial court making a factual finding to support sentencing a defendant beyond the statutory maximum, K.S.A. 38-1636 does not

involve guilt or innocence but only the determination of which system is appropriate for a juvenile offender. 273 Kan. at 778. The juvenile who is tried as an adult will be subject to the statutory maximum sentence only after a jury determines guilt beyond a reasonable doubt. Further, the procedural safeguards of the juvenile justice system are sufficient to support a determination that certification proceedings under K.S.A. 38-1636 fall outside the dictates of *Apprendi*. *Jones*, 273 Kan. 756, Syl. ¶¶ 5 and 6. Our application of *Apprendi* in *Gould* does not require a different result.

Mays' argument is without merit.

*Did the Delay Between Mays' Arrest and Preliminary Hearing Violate His Right to a Speedy Trial?*

Mays was arrested on January 27, 2000. The hearing to authorize his prosecution as an adult was held on March 9, 2000. The preliminary hearing at which Mays was bound over for trial began on April 10, 2000. Mays argues that the delay between his arrest and preliminary hearing violated his right to a speedy trial, as provided in K.S.A. 2003 Supp. 22-2902.

K.S.A. 2003 Supp. 22-2902 provides in relevant part:

"(1) Every person arrested on a warrant charging a felony or served with a summons charging a felony shall have a right to a preliminary examination before a magistrate, unless such warrant has been issued as a result of an indictment by a grand jury.

"(2) The preliminary examination shall be held before a magistrate of a county in which venue for the prosecution lies within 10 days after the arrest or personal appearance of the defendant. Continuances may be granted only for good cause shown."

The State accurately points out that this court has interpreted the 10-day time limitation of K.S.A. 2003 Supp. 22-2902(2) to be directory rather than mandatory:

"Unlike K.S.A. 22-3402, which requires the discharge of a person not promptly brought to trial, K.S.A. 22-2902(2) does not require the dismissal of the charge and the discharge of the defendant if a preliminary hearing is not provided within 10 days. *State v. Fink*, 217 Kan. 671, Syl. ¶ 3, 538 P.2d 1390 (1975). This time limitation is directory. Inconsequential delay beyond the 10 days will not require dismissal of the charges." *State v. McClain*, 258 Kan. 176, 185, 899 P.2d 993 (1995).

The *McClain* court further held that the timeliness of a preliminary hearing may be challenged only by a motion to dismiss filed pursuant to K.S.A. 22-3208 and no later than 20 days after arraignment. The failure to challenge the timeliness of the preliminary hearing by such a motion "constitutes a waiver and precludes review on appeal." 258 Kan. at 185. Because McClain failed to file a motion to dismiss, he waived the issue.

Similarly, in this case the record does not reflect that Mays ever filed a motion to dismiss pursuant to K.S.A. 22-3208; therefore, under the holding of *McClain*, Mays has waived the issue of the timeliness of the preliminary hearing.

### *Did the More than 8-Month Delay Between Mays' Arraignment and Trial Violate His Right to a Speedy Trial?*

Mays was arraigned on April 12, 2000, and a jury trial was scheduled for July 10, 2000. On June 13, 2000, the State filed a motion for continuance, which was granted. The trial was rescheduled for October 3, 2000. On October 6, 2000, during voir dire, the trial court declared a mistrial because of the unavailability of jurors and rescheduled the trial for January 2, 2001.

Mays argues that the more than 8-month delay between his arraignment and trial violated his speedy trial rights. First, Mays complains that the trial court erred in granting the State's motion for a continuance because the State needed additional time to have its ballistics evidence evaluated. Mays argues the State should have been required to put on some evidence to prove that it had made reasonable efforts to obtain that evidence.

K.S.A. 22-3402(1) provides that a person charged with a crime and held in jail solely because of that crime must be brought to trial within 90 days of arraignment unless the delay is the result of the application or fault of the defendant or the trial court orders a continuance under subsection (3). K.S.A. 22-3402(3)(c) provides that the time for trial may be extended under the following circumstances: "There is material evidence which is unavailable; that reasonable efforts have been made to procure such evidence; and that there are reasonable grounds to believe that such evidence can

be obtained and trial commenced within the next succeeding ninety (90) days."

The State accurately points out that Mays' codefendant White made the same argument in his direct appeal. This court quoted the trial court's finding that material evidence was unavailable and that the State acted in good faith:

> " 'If there's over a hundred pieces of ballistics evidence that needs to be examined, that's all very meticulous work, it's very time consuming. Unfortunately, the people that can do that are very few and far between, and it appears to me that there has not been any sort of delay that's caused simply for the purpose of delay, that [the State's] request is based upon a good faith basis.' " *White*, 275 Kan. at 600.

This court rejected White's argument, finding that the trial court did not abuse its discretion in granting the continuance. 275 Kan. at 600. Mays offers no reason why this court should change its previous ruling.

Next, Mays argues that the trial court erred in declaring a mistrial after the State would not agree to proceed to trial with only 10 jurors. Mays argues that because the jury had not been sworn, there could be no mistrial and the court should have discharged the jury panel and called a new one within speedy trial limits.

The trial court declared a mistrial on October 6, 2000, because of the unavailability of jurors. After 12 jurors were impaneled and 2 alternates selected, 4 jurors were dismissed after they indicated they could not be impartial. The jury had not yet been sworn. While the defendants agreed to proceed with fewer than 12 jurors, the State did not consent. The district court declared a mistrial.

In *White*, this court ruled that the trial court did not abuse its discretion in granting the mistrial. 275 Kan. at 602. However, the court was not faced with the argument Mays makes here, that a mistrial cannot be granted before a jury is sworn.

In support, Mays cites cases from other jurisdictions which hold that trial does not begin and jeopardy does not attach until a jury is sworn, thus no mistrial can be declared. See *Pollard v. State*, 175 Ga. App. 269, 270, 333 S.E.2d 152 (1985) (for purposes of determining whether defendant has been absent from trial and has therefore waived his right of confrontation, trial begins when jeop-

ardy attaches; jeopardy had not attached where jury had not been sworn); *Brown v. Commonwealth*, 28 Va. App. 315, 326, 504 S.E.2d 399 (1998) (mistrial could not be declared based upon juror misconduct where jury had not been sworn, trial had not commenced, and jeopardy had not attached). These cases have no precedential value and involved different issues than the one presented here.

K.S.A. 22-3423(1)(a) permits a trial court to terminate a trial and order a mistrial at any time termination is necessary because it is physically impossible to proceed with the trial in conformity with the law. The statute does not define "trial" or state that a trial begins only when the jury has been sworn and, therefore, that jeopardy has attached pursuant to K.S.A. 21-3108(1)(c). However, other statutes include jury selection within references to trial. For example, K.S.A. 2003 Supp. 22-3405 requires the defendant's presence "at every stage of the trial including the impaneling of the jury."

Furthermore, in *State v. Bierman*, 248 Kan. 80, 88-89, 805 P.2d 25 (1991), this court held that "brought to trial" for purposes of computing a speedy trial deadline under K.S.A. 22-3402(1) does not mean when a defendant is placed in jeopardy. The issue in *Bierman* was whether Bierman's right to a speedy trial was violated when voir dire commenced on the 90th day following arraignment but jeopardy under K.S.A. 21-3108(1)(c) did not clearly attach until the 91st day, when the jury was sworn. This court held the speedy trial obligation under K.S.A. 22-3402(1) was not violated. 248 Kan. at 89. The trial court's determination that a mistrial could be granted is consistent with *Bierman*.

We hold that, under K.S.A. 22-3423(1)(a), a trial court may declare a mistrial during voir dire even before the jury is sworn and jeopardy has attached. Thus, the trial court correctly invoked the provisions of K.S.A. 22-3402(4), which state that "[i]n the event a mistrial is declared . . . the time limitations provided for herein shall commence to run from the date the mistrial is declared . . . ."

Mays' speedy trial rights were not violated.

### Did the Trial Court Err in Failing to Suppress Evidence of Mays' Statement to Police Because Mays Was Incompetent to Waive His Miranda Rights?

Mays filed a pretrial motion to suppress his statement to police, arguing that he lacked the capacity to waive his *Miranda* rights. Mays requested and the trial court appointed a psychiatrist, Dr. William Logan, to evaluate Mays' mental capacity and conduct an intelligence quotient (IQ) test. In the brief filed by appellate counsel, Mays primarily relies upon Dr. Logan's evaluation and argues that his borderline intellectual functioning, his diagnosis of post-traumatic stress disorder (PTSD), and his intoxication on phencyclidine (PCP) rendered him incompetent to waive his *Miranda* rights and his statement to police should therefore have been suppressed.

In his pro se brief, Mays makes a similar argument but focuses upon his allegations that the police interrogated him for several hours without giving him a bathroom break or allowing him to eat, smoke a cigarette, or talk to his mother. He also alleges that the police threatened to kill him if he did not tell them what they wanted to hear. Finally, Mays alleges that he was under the influence of PCP (*i.e.,* "wet") and thus was very susceptible to coercion.

The State counters by arguing there was substantial competent evidence to support the trial court's determination that the waiver of *Miranda* rights was freely, voluntarily, and intelligently made. The State argues that resolution of the issue is dependent upon the credibility of the witnesses, a determination to be made by the trial court.

In reviewing a trial court's decision regarding suppression, this court reviews the factual underpinnings of the decision by a substantial competent evidence standard and the ultimate legal conclusion by a de novo standard with independent judgment. *State v. Sanders*, 272 Kan. 445, 452, 33 P.3d 596 (2001), *cert. denied* 536 U.S. 963 (2002). This court does not reweigh evidence, pass on the credibility of witnesses, or resolve conflicts in the evidence. *State v. Washington*, 275 Kan. 644, 669, 68 P.3d 134 (2003).

A defendant's waiver of his or her *Miranda* rights must be knowing, voluntary, and intelligent under the totality of the circum-

stances. *State v. Makthepharak*, 276 Kan. 563, 567, 78 P.3d 412 (2003). In determining whether a defendant's confession is voluntary, a court looks at the totality of the circumstances. The State bears the burden of proving that a defendant's confession is voluntary and therefore admissible by a preponderance of the evidence. "The essential inquiry is whether the statement was the product of the free and independent will of the accused. [Citation omitted.]" *State v. Groschang*, 272 Kan. 652, 662, 36 P.3d 231 (2001).

Where, as here, the accused is a juvenile, this court exercises "the greatest care in assessing the validity of the juvenile's confession." *State v. Bell*, 276 Kan. 785, Syl. ¶ 7, 80 P.3d 367 (2003). In determining whether a juvenile's confession is voluntary, the district court should consider the following factors on the record: "(1) the age of the minor, (2) the length of the questioning, (3) the minor's education, (4) the minor's prior experience with the police, and (5) the minor's mental state." 276 Kan. 785, Syl. ¶ 7.

The evidence regarding the first four factors was undisputed. Mays was 16 years of age at the time he was questioned, although he turned age 17 a few days later. As to the length of questioning, Detective Howard first made contact with Mays at 2:30 p.m. At 3 p.m., Mays agreed to give a statement. After an interview lasting an hour and a half, detectives recorded Mays' formal statement. The questioning was not prolonged, and Mays does not argue that the length of questioning impacted the voluntariness of his statement. As to the third factor, Mays had a 10th grade education. Regarding the fourth factor, there was no evidence that Mays had any prior experience with police, and Mays testified that he had never seen an Advice of Rights form before.

Mays' evidence at the hearing on the motion to suppress and his arguments on appeal focus on the final factor, mental state. Mays testified that he was under the influence of PCP and marijuana during his interview with police. He also testified that he did not read the Advice of Rights form and did not understand its implications.

Dr. Logan testified that he met with Mays to evaluate his mental state at the time of the shootings as well as his capacity to waive

his *Miranda* rights. As to Mays' mental state, Dr. Logan testified that the traumatic death of Mays' 10-year-old cousin when Mays was 15 years old had a profound effect on Mays. Mays had recurring nightmares and believed he could sometimes see or hear his cousin's spirit. He became socially withdrawn, stopped associating with friends, stopped playing basketball, and had difficulty sleeping and concentrating. According to Dr. Logan, Mays suffered additional stress from being called as a witness in the murder trial and had experienced some harassment and threats. Mays' school work deteriorated, and he eventually dropped out of school. Also, after his cousin's death, Mays' use of alcohol, marijuana, and PCP increased dramatically. Dr. Logan characterized Mays as showing evidence of PTSD, although he questioned the relevance of that diagnosis as to Mays' comprehension ability.

Dr. Logan also evaluated Mays' IQ. He determined that Mays had an overall IQ of 80; however, his verbal IQ, which relates to his understanding of written and verbal material, was only 77, a score which falls in the borderline intellectual functioning range (formerly referred to as borderline retarded). Dr. Logan also determined that Mays reads at an early second grade level and has a "very limited ability to read." Dr. Logan testified, "Certainly our testing indicated that he probably wouldn't be diagnoseable [*sic*] mentally retarded. But in terms of intellectual skills that were needed to understand *Miranda* rights and utilize that information to make a decision, [Mays] would function in the retarded range . . . ."

Regarding Mays' interview with police, Dr. Logan testified Mays told him he was under the influence of PCP which made him drowsy and made him want to tell the police whatever they wanted so they would leave him alone. Mays also told him that the police threatened him with the death penalty. Mays also said he did not understand his *Miranda* rights when he was interviewed by detectives, although by the time of the hearing, after 9 months of a jailhouse education, Dr. Logan believed Mays had a good layman's understanding of those rights.

When asked on cross-examination whether Mays would have been able to understand and knowingly waive his *Miranda* rights, Dr. Logan responded:

"Based on his overall reading level, I think he would have had difficulty comprehending the information he was presented. If he is accurate in the fact that he recently ingested PCP, and I can't tell whether that's true or not . . . and that he was intimidated and scared and didn't really tend [sic] to the rights presented to him and didn't really understand very much about what was presented to him, if all that is accurate as he presents, then I would say probably he did not understand his *Miranda* rights."

Mays' arguments are based upon this opinion. However, the State notes that Dr. Logan's opinion was based upon the assumption that Mays was under the influence of PCP, was coerced, and did not have his *Miranda* rights fully explained. As the State points out, when these assumptions are changed, Dr. Logan's opinion supports a finding that Mays was capable of understanding his rights. When asked about the importance of these assumptions to his opinion, Dr. Logan testified:

"I still think he would have had difficulty understanding certain words such as waiving rights, being coerced, and he may—he still would have had a hard time weighing what he did know about deciding on the advisability of talking to police detectives. But in terms of his understanding, yes, he could have potentially if some of the things he told me were not accurate, if he wasn't that scared, if he wasn't threatened, if he hadn't taken PCP and if the officers had taken some time to explain those rights to him, he may have understood."

The State argues that conflicting evidence was presented regarding whether Mays had taken PCP, had been threatened, and had his rights explained. The State points to the testimony of Detective Howard, who interviewed Mays at the detective bureau shortly after Mays' arrest on January 27, 2000. Howard presented Mays with an Advice of Rights form, and they went over it together. Howard asked Mays to read the first line out loud, but Mays wanted to read the rest of the form to himself.

Howard asked Mays if he understood what he had read, and Mays indicated he did. When Howard told Mays he would have to sign the form if he wanted to waive his rights and talk to police, Mays said he wanted to think about it. At that point, Howard left the room for half an hour to eat lunch. He offered food to Mays who declined. After lunch, Howard asked Mays if he had decided whether he wanted to give a statement, and Mays signed the waiver form in front of Howard and another detective. The detectives then

interviewed Mays for about an hour and a half before taking a formal, taped statement.

At the beginning of the recorded portion of the interview, Howard went over the Advice of Rights form with Mays a second time, reading his *Miranda* rights aloud and confirming that Mays understood those rights and agreed to waive them. Mays then gave a recorded statement. Detectives Howard and Lawson conducted the first half of the formal interview, and Detectives Zeigler and Golubski conducted the second half. The first pair of detectives were investigating the January 26 shooting, while the second pair were investigating the January 24 shooting.

Howard testified that law enforcement officers made no promises or threats to Mays and that no physical contact took place. Howard observed that Mays was alert but "seemed a little drowsy," so he asked if Mays had used any drugs. Mays indicated he had smoked some marijuana earlier in the day but said nothing about PCP. Mays showed no sign of the effects of PCP. Howard knew Mays was 16 years old and had a 10th grade education. Howard listened as Mays read the first line of the Advice of Rights form and noticed no difficulty.

Thus, the evidence relevant to many of Mays' arguments and Dr. Logan's opinion was conflicting. Application of many of the *Bell* factors and the overall determination of the totality of the circumstances came down to an issue of credibility which is left to the trial court to determine. See *Bell*, 276 Kan. 785, Syl. ¶¶ 6, 7, and 8.

Moreover, while a defendant's low intellect and mental condition are factors to be considered in determining the voluntariness of a statement, "a defendant's mental condition, by itself and apart from its relation to official coercion, should never dispose of the inquiry into constitutional voluntariness." *State v. Lane*, 262 Kan. 373, 386, 940 P.2d 422 (1997) (citing *Colorado v. Connelly*, 479 U.S. 157, 164-65, 93 L. Ed. 2d 473, 107 S. Ct. 515 [1986]). Mental state is only one consideration when assessing the totality of the circumstances surrounding the waiver of *Miranda* rights. Further, "there must be a link between coercive activity of the State and the confession. [Citation omitted.]" *Lane*, 262 Kan. at 386.

Mays does not allege that the police took advantage of his low intellect or poor reading ability to coerce a confession. To the contrary, detectives went over his *Miranda* rights a second time before taking a recorded statement, and Mays indicated he understood and wished to waive those rights.

Thus, there was substantial competent evidence to support the district court's decision to deny Mays' motion to suppress his statement to police. Under the totality of the circumstances it was not error to determine that May's waiver of his *Miranda* rights was knowing, voluntary, and intelligent.

### *Did the Doctor's Testimony Regarding the Proximate Cause of a Victim's Death Negate a Necessary Element of Mays' Conviction of First-Degree Murder?*

Mays' next argument is that the coroner's testimony regarding the negligent treatment received by one of the shooting victims at the emergency room negated proximate cause. In essence, his argument is that there was insufficient evidence to convict him of the first-degree murder of Joseph Morton because the gunshot wounds were not the proximate cause of Morton's death.

When a defendant challenges the sufficiency of evidence, this court's standard of review is whether, after review of all of the evidence, viewed in the light most favorable to the State, the appellate court is convinced that a rational jury could have found the defendant guilty beyond a reasonable doubt. *State v. Beach*, 275 Kan. 603, Syl. ¶ 2, 67 P.3d 121 (2003).

Dr. Erik Mitchell performed the autopsy on victim Morton and testified that Morton died of gunshot injuries. However, Dr. Mitchell also testified that while Morton was being treated in the emergency room, a chest tube was inserted incorrectly into Morton's abdominal cavity and an endotracheal tube was inserted incorrectly into Morton's esophagus. Instead of allowing Morton to breathe, the endotracheal tube actually cut off Morton's breathing. Had the intubation been performed correctly, Dr. Mitchell believed Morton might have lived. However, without any medical treatment, Morton would have bled to death. Dr. Mitchell stated, "His only chance at survival [was] control of the airway and then

control of the bleeding. If his airway had been controlled, they would have had a chance to address the bleeding and I think he would have had a good chance at survival."

As this court stated in *State v. Rueckert*, 221 Kan. 727, 737, 561 P.2d 850 (1977):

"Where a person inflicts upon another a wound which is calculated to endanger or to destroy life, it is not a defense to a charge of homicide that the alleged victim's death was contributed to or caused by the negligence of the attending physicians or surgeons. The concept of intervening cause in both tort and criminal law is predicated upon foreseeability. Since human beings are not infallible, some degree of a doctor's negligence is foreseeable and cannot be used by a defendant to exonerate himself. Neither can a defendant use as a defense the possibility that different or more skillful treatment might have saved the life of the deceased, and thereby avoid the consequences of his attack. Defendant must show that erroneous or unskilled medical care became the efficient intervening cause of death and superseded the effect of the wounds inflicted by defendant so as to become the proximate cause of death. These are all jury questions. [Citations omitted.]"

In this case, there was a sufficient basis for a rational jury to determine that, even if the treatment Morton received at the emergency room contributed to his death, the treatment was not an intervening cause of death and did not supersede the effect of the gunshot wounds. Dr. Mitchell testified that Morton died as a result of gunshot wounds. Also, Dr. Mitchell testified that without medical treatment, Morton would have bled to death from his wounds. Mays' argument on this point fails.

### *Did the Trial Court Err in Instructing the Jury Regarding Proximate Cause Defense?*

Furthermore, the jury was instructed on Mays' theory of defense that the physicians' negligent treatment of Morton was the sole proximate cause of his death. However, Mays complains that the trial court erred in giving Instruction No. 16 which related to Mays' defense that the physicians' negligence was the sole cause of Morton's death. He contends the instruction was internally inconsistent, could have misled the jury, and deprived him of a meaningful instruction on his theory of defense.

When reviewing challenges to jury instructions, this court must consider the instructions as a whole and not isolate any one instruc-

tion. " 'If the instructions properly and fairly state the law as applied to the facts of the case, and a jury could not reasonably have been misled by them, the instructions do not constitute reversible error even if they are in some way erroneous. [Citations omitted.]' " *State v. Peterson*, 273 Kan. 217, 221, 42 P.3d 137 (2002).

Instruction No. 16 read as follows:

"One of the theories of the defense is that negligent treatment by physicians at the Bethany Medical Center was the sole proximate cause of death of Joseph Morton and not the gunshot wound he sustained. You are instructed that if you find defendants did cause the injuries inflicted on the person of Joseph Morton, then you must determine whether the acts of the defendants contributed to the death of Joseph Morton. If you find defendant's [*sic*] acts contributed to the death of Joseph Morton, then responsibility cannot be avoided by the fact that independent causes such as negligence of others also contributed to the death. However, if you find the proximate cause of death resulted solely from erroneous treatment of the physicians, you must acquit the defendants of the offense charged of any unlawful homicide charge . . . ."

Instruction No. 16 must be read in context. The trial court gave the jury three other instructions also dealing with proximate cause.

Instruction No. 13 read:

"To constitute an unlawful homicide . . . there must be, in addition to the death of a human being, an unlawful act which was a proximate cause of that death.

"The proximate cause of a death is a cause which, in natural and continuous sequence, produces the death and without which the death would not have occurred.

"There may be more than one proximate cause of death. When the conduct of two or more persons contributes concurrently as proximate causes of a death, the conduct of each of said persons is a proximate cause of death regardless of the extent to which each contributes to the death. A cause is concurrent if it was operative at the moment of death and acted with another cause to produce the death."

Instruction No. 14 read:

"Where the original injury is a proximate cause of the death, the fact that the immediate cause of death was the medical or surgical treatment administered or that such treatment was a factor contributing to the cause of death will not relieve the person who inflicted the original injury from responsibility."

Instruction No. 15 read:

"The fact, if it be a fact, that some other person was guilty of negligence which was a contributory cause of the death involved in the case, is no defense to a criminal charge."

The trial court took these three other instructions directly from *Rueckert*. Instruction No. 16 was patterned after a similar instruction given in *State v. Shaffer*, 223 Kan. 244, 249-250, 574 P.2d 205 (1977).

During the instruction conference, Mays objected to the giving of the proximate cause instructions because he contended they shifted the burden to him to prove that the physicians' negligence was the proximate cause of Morton's death. Mays believed *Shaffer* and *Rueckert* were distinguishable on their facts.

In *Shaffer*, the victim was shot in the head and suffered irretrievable brain damage. His family allowed his kidneys to be transplanted, the respirator was then shut off, and the victim's bodily functions ceased. The defendant argued to the jury that the victim's death was caused by the transplant operation. The jury was instructed on the defense theory as follows:

" 'With regard to Count I of the information, one of the theories of the defense herein is that the kidney transplant was the cause of the death of Donald W. Becker and not the gun shot [*sic*] wounds to the head. You are instructed in this regard that if you find defendant did cause the wounds to be inflicted on the person of Donald W. Becker then you must determine whether the act of defendant contributed to the death of Donald W. Becker. If you find defendant's acts contributed to the death of Donald W. Becker then responsibility cannot be avoided by the fact that independent causes such as the negligence of others also contributed to the death. However, if you find the cause of death resulted solely from erroneous treatment by the physicians you must acquit defendant of the offense charged in Count I.' " 223 Kan. at 249-50.

This court found the instruction was a proper statement of the applicable law. 223 Kan. at 250.

In *Rueckert*, which is more fully discussed in reference to the previous issue regarding Dr. Logan's testimony, the defendant made similar arguments about the medical treatment received by the victim and the cause of death. This court found no error in instructions identical to Instructions No. 13, 14, and 15 given in

this case, noting the instructions were "a correct reflection of the law." 221 Kan. at 737.

Instruction No. 16 and the instructions accompanying it accurately stated the law as reflected by *Rueckert* and *Shaffer*, which we find controlling. See also *State v. Gholston*, 272 Kan. 601, 605-09, 35 P.3d 868 (2001), *cert. denied* 536 U.S. 963 (2002) (no medical evidence required to establish cause of death where victim suffered gunshot wound to head and life support was withdrawn; defendant presented no evidence of superseding cause of death).

### Did the Trial Court Err in Denying Mays' Motion for Severance?

In his pro se brief, Mays argues the trial court erred in denying his motion to sever his trial from that of his codefendants. Mays argues he and his codefendants had antagonistic defenses and that if their trials had been severed Mays could have called the other defendants as witnesses.

Mays did not file a written motion to sever, as did his other codefendants. However, during voir dire at the first trial setting in October 2000, Mays' counsel orally joined in the codefendants' motion to sever based upon Mays' defense of PTSD. The trial court stated it would hear that matter later. As discussed above, the court eventually declared a mistrial because of lack of jurors and rescheduled the trial for January 2001. Before that trial began, Mays' counsel asked the court to clarify whether she would be able to present Dr. Logan's testimony about Mays' diagnosis of PTSD and whether she could refer to that evidence in her opening statement. When other counsel expressed concern that Mays' defense might be antagonistic to theirs, Mays' counsel stated, "So, Judge, I also remembered that when we were in here in October I did ask the Court to sever the trial and I asked for severance on Shawndell and I don't believe the Court ever ruled on that." The codefendants also renewed their motions for severance.

The trial court denied the codefendants' motion to sever, ruling that their defenses were not antagonistic.

This court considered and rejected codefendant White's argument that his trial should have been severed based on antagonistic

defenses in *State v. White*, 275 Kan. 580, 590-91, 67 P.3d 138 (2003):

"Shawndell Mays did not point the finger at White. Further, neither Dr. Logan's testimony nor Shawndell Mays' defense were irreconcilable with White's assertion that he acted in self-defense and was objectively justified in doing so. White's statement was that he fired four or five shots after he was shot at or observed a known aggressor reaching for a gun. Dr. Logan's testimony did not negate such classic self-defense situations and implicitly strengthened White's contention that the tension between the two factions was intense. While there may have been some inconsistency in the evidence, there was not a dichotomy in the defenses. As presented, the defenses were not mutually exclusive. [Citation omitted.] Nor has there been any showing of actual prejudice."

Mays' argument that the codefendants had antagonistic defenses is the same argument made by White and is similarly rejected.

Mays also contends that, had his case been severed, he would have been able to offer "all of the evidence in support of his defense instead of merely relying on the testimony of Dr. Logan." He argues his codefendants would have testified that Mays was under the influence of PCP ("wet") during the shootings and that there was no agreement to commit the murders. There is no indication in the record that Mays raised this argument before the trial court; rather, he relied solely upon the argument that his defense of PTSD was different from his codefendants' defenses. Under these circumstances, it cannot be said that the trial court's denial of his motion to sever was an abuse of discretion. See *White*, 275 Kan. at 589-91.

### Did the Trial Court Err in Admitting into Evidence the Codefendants' Redacted Statements?

Next, Mays, in his pro se brief, argues that the trial court erred by allowing the codefendants' redacted statements to be admitted into evidence at trial. However, none of the codefendants' statements are included in the record on appeal, making it impossible for this court to review Mays' claim of error. Furthermore, the same argument was considered on its merits and rejected in *White*, 275 Kan. at 591-95.

The *White* court first discussed the holding of *Bruton v. United States*, 391 U.S. 123, 126, 20 L. Ed. 2d 476, 88 S. Ct. 1620 (1968),

that a defendant is deprived of his right of confrontation when the facially incriminating confession of a nontestifying codefendant is introduced at their joint trial, even if the jury is instructed to consider the confession only against the codefendant. 275 Kan. at 591. However, use of such a confession was upheld where it was redacted to remove all references to a codefendant in *Richardson v. Marsh*, 481 U.S. 200, 211, 95 L. Ed. 2d 176, 107 S. Ct. 1702 (1987). 275 Kan. at 592. Accordingly, this court noted its own previous holding that " 'redaction of a confession is proper if any suggestion of a codefendant's involvement in the crime charged can be eliminated from the statement, but generally an edited statement should not be admitted if it explicitly suggests the participation of the complaining defendant.' " 275 Kan. at 593 (quoting *State v. Swafford*, 257 Kan. 1099, 1102, 913 P.2d 196 [1996]).

The *White* court then discussed proper and improper methods of redaction and noted that the digital editing process used in the case obviated many of the problems caused by other less sophisticated redaction methods. 275 Kan. at 593-95. The court concluded: "The redacted statements eliminate all references to White's existence, do not direct the jury's attention to White, do not facially incriminate White, and do not violate the holding in *Bruton*. The district court did not err in admitting the redacted statements of White's codefendants." 275 Kan. at 595.

Mays' argument that the trial court erred in admitting the redacted statements of his codefendants is similarly rejected.

*Did the Trial Court Err in Admitting a Codefendant's Statement Because It Was Inadmissible as to Mays and Violated his Right to Confront Witnesses?*

Mays' final pro se argument encompasses several issues. First, Mays argues the trial court erred in admitting certain hearsay testimony regarding the codefendants' conspiracy. Alberta Bailey, a former roommate of Michael White's, testified that White told Bailey and her fiance to watch the news "because we smoked that nigger Antwan." No contemporaneous objection was made. White's counsel then sought to cross-examine Bailey about the statement because there was no victim named Antwan involved in

the case. When White's counsel asked Bailey to repeat White's statement, Mays' counsel objected on the grounds of prejudice to Mays and asked that the witness be instructed to use the pronoun "I" rather than "we" in order to cure the *Bruton* problem. The trial court overruled Mays' objection, finding there was no confrontation problem. The witness then repeated White's statement.

Mays also argues there was insufficient evidence to support his conviction of conspiracy to commit first-degree murder. The evidence regarding the conspiracy count consisted of the testimony of Bailey described above, as well as the testimony of two other people who lived in the same crack house as Bailey. Anthony Dantzler testified that White and several other young men, including Mays, came in and out of the house with guns in their hands near the end of January 2000. Dantzler testified that at one point when the young men came back to the house they were happy and jumping around. Dantzler heard something mentioned about a white truck. Union and Brooks were driving a white truck when they were shot.

Another housemate, Gary Hahn, also testified observing White and his "buddies" with guns at the house around the time of the shootings. Hahn heard the group talk about going to do a hit before they left the house. When they returned, they were jumping up and down and laughing.

Mays contends that all of the evidence mentioned above was hearsay and it was inadmissible under the coconspirator exception to the hearsay rule. See K.S.A. 2003 Supp. 60-460(i)(2). In fact, only those portions of the testimony where the witnesses described the young men's statements or conversations were hearsay. The rest of the testimony involved the witnesses' visual observations of the young men and was not hearsay. In any event, Mays did not object to any of the evidence on hearsay grounds.

A defendant's failure to timely object at trial to alleged hearsay statements precludes the defendant from raising the issue on appeal. *State v. Carr*, 265 Kan. 608, 620, 963 P.2d 421 (1998). This is true even where the defendant alleges a violation of the Confrontation Clause of the Sixth Amendment to the United States

Constitution. *State v. Bryant*, 272 Kan. 1204, 1207-08, 38 P.3d 661 (2002).

Finally, as part of this argument, Mays asserts there was insufficient evidence of a conspiracy. As to the sufficiency of the evidence, this court must review all of the evidence, viewed in the light most favorable to the prosecution, to determine whether a rational factfinder could have found the defendant guilty beyond a reasonable doubt. *State v. Beach*, 275 Kan. 603, Syl. ¶ 2, 67 P.3d 121 (2003). Based upon the evidence, a rational jury could have found that Mays agreed with the other codefendants to kill members of the Quinn family and their associates and that he committed the overt acts of obtaining a weapon and driving around looking for victims. See *State v. Davis*, 277 Kan. 231, 243, 83 P.3d 182, 190 (2004).

### *Did Cumulative Error Deny Mays a Fair Trial?*

Mays also contends that the combination of errors in his case denied him a fair trial. None of the issues above reveals any trial error; therefore, Mays' cumulative error argument is rejected.

Affirmed.