No. 91,432

STATE OF KANSAS, *Appellee*, v. SHAWNTTIS K. FRANKLIN, *Appellant.*

(121 P.3d 447)

Opinion filed October 21, 2005.

*Brent Getty*, assistant appellate defender, argued the cause, and *Theresa L. Barr*, assistant appellate defender, was on the brief for appellant.

*Debra S. Byrd Peterson*, deputy district attorney, argued the cause, and *Nola Foulston*, district attorney, and *Phill Kline*, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

ALLEGRUCCI, J.: Shawnttis Franklin appeals her jury convictions for attempted first-degree murder and aggravated burglary. Franklin was sentenced to concurrent terms of 267 and 34 months. The court transferred the case from the Court of Appeals pursuant to K.S.A. 20-3018(c). Franklin claims: (1) the trial court abused its discretion in admitting cellular telephone text messages into evidence; (2) the trial court abused its discretion in admitting eyewitness identification evidence; (3) the eyewitness identification instruction to the jury was erroneous; (4) the evidence of aggravated burglary was insufficient to support defendant's conviction; (5) the trial court's refusal to strike jurors for cause prejudiced the

defendant; and (6) the trial court erred in sentencing defendant by not requiring the jury to determine her criminal history beyond a reasonable doubt.

## FACTS

During the early morning hours of March 14, 2003, Robert Coleman, Mesia Green (Coleman's girlfriend), and Ebony Williams (Coleman's sister) were all sleeping in various rooms in the same house. Williams was awakened by a loud noise in the living room. Upon investigation, Williams observed two people run out the door with Green in pursuit. After discovering that Green had been stabbed, Williams called the police.

At 1:54 a.m. Wichita police officers were dispatched to 1143 N. Terrace in response to Williams' call. Officers Carr and Menges found Green lying in bed on her stomach with multiple stab wounds in her back. Green told the officers that Shawnttis Franklin had stabbed her. Williams told the officers that she had seen a girl named "Pooky" running out of the house and identified "Pooky" as Shawnttis Franklin's nickname. Officer Carr asked Green if she was identifying the Shawnttis Franklin that lived at 1132 N. Green Street, and Green stated that she was referring to the Shawnttis Franklin who lived at that address. Green informed the officers that Coleman had previously dated Franklin and that Franklin was jealous that Green was seeing Coleman.

Green was taken by ambulance to the hospital and treated for nine stab wounds in her back, blood in her chest cavity, and a collapsed lung. Green survived the attack. Franklin was charged with one count of aggravated burglary, one count of attempted first-degree premeditated murder, and, in the alternative, one count of aggravated battery.

At trial, Robert Coleman testified that he had lived with the defendant for approximately a year and a half. After an argument in the beginning of March 2003, they separated. Coleman stated that he was having a "fling" with Mesia Green at the time he and the defendant were arguing.

Coleman showed a Wichita police detective text messages on his telephone. Coleman told the detective that he received the text

messages from the telephone number he knew belonged to the defendant. The first text message was received at 5:20 a.m. on March 14, the day of the stabbing, and stated: "I whupped that bitch and served her to let her know I ain't the one I told you what I did and didn't do you know me I tell you everything so stay down for her then you know." The second text message was received at 10:52 a.m. on March 14, and stated: "You betta get her out of WK for she be dead." The third text message was received at 10:57 a.m. on March 14, and stated: "I got my pistol let me hear she still down here on Blood gang we finna smoke that bitch."

Robert Coleman's aunt, Patricia Bell, received a telephone call from the defendant between 10:00 and 11:30 a.m. on March 14 or 15. The defendant stated to her that she had stabbed Mesia Green and would do it again if she saw her that day, and that she was going to kill Mesia.

At trial, the defendant presented an alibi defense. Franklin testified that she was staying with friends in Arkansas City the night of March 13-14 and that her mother and sister had driven from Wichita for a brief visit. Defendant denied making calls on her cellular telephone on March 14. She explained that her telephone did not work in Arkansas City and, in addition, she had left her telephone with her cousin, Ishmael Agnew. Several witnesses, including friends from Arkansas City and her mother and sister, testified and corroborated defendant's alibi for the night of March 13-14.

There was also evidence rebutting defendant's alibi. Defendant's mother had told a police officer that she saw defendant in Arkansas City on the night of March 14-15. One of the Arkansas City friends, who was supposed to have been present when defendant's mother visited her in Arkansas City, had informed the police that the last time he saw defendant's mother was 2 to 3 weeks before March 14. Defendant had the cellular telephone when arrested in Arkansas City on March 18.

## ADMISSION OF CELLULAR TELEPHONE TEXT MESSAGES

Defendant filed a motion in limine to prohibit the State from introducing the cellular telephone text messages into evidence, as-

serting that the text messages were hearsay and were protected from disclosure by marital privilege. The district court found that the text messages were not to be offered to prove the truth of the statements and, thus, were not hearsay. The district court further ruled that a common-law marriage had not been established so the marital privilege did not apply, and that the State would be required to lay a proper foundation at trial before introducing the text messages at trial.

When the State sought to introduce evidence of the text messages at trial, defense counsel objected, arguing that the foundation had not been established. Defendant's counsel further argued that the statements were hearsay and, if not hearsay, the statements were more prejudicial than probative. The objection was overruled. The State presented the evidence. Defense counsel twice objected by stating, "Same objection." Defense counsel did not assert that the text messages were protected by marital privilege at trial. On appeal, defendant additionally argues that the text messages were inadmissible hearsay, because the identity of the sender was not established, and the messages were protected by the marital privilege. We note that when a motion in limine is denied, the moving party must object to the evidence at trial to preserve the issue on appeal. *State v. Saenz*, 271 Kan. 339, 349, 22 P.3d 151 (2001). Because Franklin failed to object claiming marital privilege, that question is not preserved.

An appellate court's first consideration when examining a challenge to a district court's admission of evidence is relevance. "Once relevance is established, evidentiary rules governing admission and exclusion may be applied either as a matter of law or in the exercise of the district judge's discretion, depending on the contours of the rule in question." *State v. Carter*, 278 Kan. 74, 77, 91 P.3d 1162 (2004).

The district court concluded that none of the text messages were offered for the truth of the matter asserted and, thus, were not hearsay. Hearsay is defined as evidence of "a statement which is made other than by a witness while testifying at the hearing, offered to prove the truth of the matter stated." K.S.A. 2004 Supp. 60-460. Hearsay evidence is excluded unless it fits within specific statutory

exceptions. K.S.A. 2004 Supp. 60-460. Accordingly, the admission of out-of-court statements (if hearsay, *i.e.*, to prove truth of matter asserted) is controlled by statute and requires the interpretation of a statute. This court reviews the interpretation of a statute as a question of law, using a de novo standard. *State v. Maass*, 275 Kan. 328, 330, 64 P.3d 382 (2003).

Two of the text messages were threats of future action not acted on: "You betta get her out of WK for she be dead," and "I got my pistol let me hear she still down here on Blood gang we finna smoke that bitch." These messages were relevant to establish defendant's intent when she stabbed Green. Defendant was charged with attempted first-degree murder and, in the alternative, aggravated battery. These text messages show that defendant intended to kill Green rather than just injure her. Although the messages involve future action, they were offered to prove the truth of the matter — that defendant wanted to kill Green.

The third message, which began with the statement, "I whupped the bitch," was relevant to establish defendant's recognition of what she had done. The State argues that the statement was not offered to prove the truth of that statement, but to show the defendant's state of mind. This argument is without merit. The message is a simple declaration of what the sender had done. Although the jury could have inferred that the sender was boasting, the actual content of the statement concerns what the sender had done rather than what she thought about it. Thus, the third text message was admitted into evidence to prove that the sender had "whupped the bitch," and was hearsay.

The district court's conclusion that the third text message was not hearsay was in error. Nevertheless, the State argues that even if the message was hearsay, it was admissible as the previous statement of a person who was present in the courtroom pursuant to K.S.A. 2004 Supp. 60-460(a), which allows an exception to the admission of hearsay for a statement "previously made by a person who is present at the hearing and available for cross-examination with respect to the statement and its subject matter, provided the statement would be admissible if made by declarant while testifying as a witness."

Even though the defendant was in the courtroom and had testified, the defendant contends that 60-460(a) does not apply because the sender of the text message is unknown and, therefore, it could not be determined whether the message was made by a person present in the courtroom.

The State asserts that there was sufficient evidence to show that the sender of the text message was the defendant. The State points to evidence which showed, among other things, that the content of the text messages parallels the evidence of defendant's activities and statements: Mesia Green was stabbed, and she identified defendant as one of two people who ran out the door after the attack. Robert Coleman testified that, although he did not remember what he and defendant were arguing about when they separated on the first of March 2003, he conceded that they were probably arguing about Green. Green had stated to one of the first police officers on the scene that the defendant had stabbed her because defendant was angry that Green was seeing Coleman. In addition, defendant told Patricia Bell that she had stabbed Green and that she was going to kill Green. Defendant stated to Krista Nichols that she "cut that bitch up" because of Coleman. Defendant testified that she and Coleman sometimes communicated by text messages. The text messages at issue came from defendant's cellular telephone. Contrary to defendant's claim of leaving her cellular telephone in Wichita, defendant's cellular phone was taken from her when she was arrested in Arkansas City on March 18.

Contrary to Franklin's claim, this evidence reasonably implies that she sent the text messages to Coleman. Accordingly, K.S.A. 2004 Supp. 60-460(a) and (g) (admissions by parties) apply, and the text message may be admitted as an exception to the rule precluding the admission of hearsay. If the trial court's ruling is correct, it will be upheld, even if the trial court relied upon the wrong reason. *State v. Graham*, 277 Kan. 121, 133, 83 P.3d 143 (2004).

## ADMISSION OF EYEWITNESS IDENTIFICATION EVIDENCE

Defendant filed a motion in limine seeking to exclude testimony of Mesia Green's identification of defendant, claiming it was un-

reliable. One of the grounds for the motion was that Detective Gulliver showed Green only a photograph of defendant, rather than a photo array of several similar individuals.

We note that the district judge applied the analysis for eyewitness identification from *State v. Hunt*, 275 Kan. 811, 817-18, 69 P.3d 571 (2003), and had concluded that, under the circumstances, the procedure was not unnecessarily suggestive. In addition, at trial, defense counsel did not object to Mesia Green's testimony identifying defendant as her attacker. Nor did defense counsel object to Detective Gulliver's testimony that he showed Green a photograph of defendant, which Green identified as the person who stabbed her. Instead, during the trial, defense counsel acquainted the jury with police procedure for photo identification while cross-examining Detective Gulliver:

"Q. Well, do you think it's good police procedure to just sort of take a picture of one person and set it in front of an eyewitness and say, Is that — say, Do you recognize this picture?

"A. Oh, we wouldn't if she had not identified her as the individual who committed the crime. It's common practice that, if an individual identifies someone as committing a crime, that we do show them a single picture; not for identification purposes but just to assure that the same people — person that the victim is talking about is the same person that we're thinking of.

"Q. Why is that a better procedure than using a photo array, if you wanna be sure it's the same person?

"A. It's not for identification purposes. It's simply to assure that we have the same person that the victim is identifying. Just in case there was another Shawnttis Franklin who goes by the name of Pooky out there, we would want to assure that she was the one that we were thinking of."

On appeal, defendant argues that showing Green only one photograph was unduly suggestive and there was a substantial likelihood of a mistaken identification.

The procedure used by police in the present case is significantly different from the procedure described in *Hunt*. Here, Mesia Green told an officer who was dispatched to the crime scene that a black female named Shawnttis stabbed her. The officer recognized the name and asked if it was Shawnttis Franklin of Green Street. Green said it was. Ebony Williams also told the officer that she saw Shawnttis Franklin hurrying out of the house. On March

17, after Green's condition had improved, Detective Gulliver visited her in the hospital to obtain a statement from her and, to "make sure that the suspect she identified initially was in fact the suspect in the case," he showed her a photograph of the defendant and asked if she recognized the person. Green identified the person as her assailant.

Defendant argues that Gulliver's showing the photograph to Green was a one-person line-up and cites cases, including *Hunt*, disfavoring that procedure. The State cites *State v. Tucker*, 2004 WL 2251800 (Ohio App. 2004) (unpublished opinion), in which an identification procedure similar to the one in the present case was at the center of an issue of ineffective assistance of counsel. In that case, 1 month after the victim was shot dead outside a bar, the woman who was with the victim the night of the shooting first spoke with police. She knew the name of the shooter, she gave police his name, and then police showed her "a photograph of that man to confirm who you were talking about." 2004 WL 2251800, *2. The victim's companion had had a good long look at defendant before and during the shooting. When driving her home, one of the victim's friends told her the shooter's name and she then matched defendant's name with a photograph of him posted on the internet. In these circumstances, the Ohio Court of Appeals concluded that defendant was not deprived of effective assistance of counsel because the identification was sufficiently reliable to be admissible. 2004 WL 2251800, *2.

We note that the reliability of the identification in the present case is greater than in *Tucker*. Green not only saw the defendant at the crime scene, Green also identified her assailant by name and knew defendant's address. Under the circumstances, showing Green a photograph of the defendant a few days later to make certain that Green and the police had the same person in mind was not an impermissibly suggestive lineup.

## EYEWITNESS IDENTIFICATION INSTRUCTION

Defendant requested an eyewitness identification instruction that combined features of the pattern instruction, *Hunt* factors, and an admonition that "eyewitness testimony can be unreliable."

The trial judge refused defendant's instruction. Instead, the trial court gave the pattern instruction for eyewitness identification, PIK Crim. 3d 52.20. Defendant complains that the instruction was erroneous because the factors do not coincide with those outlined in *Hunt*.

Green knew her assailant's identity and told police her assailant's name. The detective showed Green a picture of the defendant to confirm that he and Green were talking about the same person. This type of identification is not implicated by *Hunt*. Thus, an identification instruction pursuant to *Hunt* is not warranted by the facts of this case, and the defendant's claim of error has no merit.

## SUFFICIENCY OF THE EVIDENCE FOR AGGRAVATED BURGLARY

The elements of aggravated burglary in this case were (1) knowingly entering a house (2) without authority (3) with the intent to commit a felony therein (4) when there was a human being in the house. PIK Crim. 3d 59.18. Defendant contends that the State failed to prove that she did not have authority to enter the Coleman house.

When a defendant challenges the sufficiency of evidence, this court's standard of review is whether, after review of all of the evidence, viewed in the light most favorable to the State, the appellate court is convinced that a rational jury could have found the defendant guilty beyond a reasonable doubt. *State v. Mays*, 277 Kan. 359, 377, 85 P.3d 1208 (2004).

Defendant testified that she had permission from Robert and his mother to be in the Coleman residence. The State did not rebut this testimony. Defendant also testified that she owned a car that was in the garage of the Coleman residence and she had clothes in the house because she and Ebony Williams wore each other's clothes.

The State relied on the following circumstantial evidence to prove aggravated burglary: the attack occurred at 1:54 a.m. when the occupants of the house were sleeping; the defendant did not speak to anyone in the house during the attack; defendant had not been seeing Robert Coleman for several weeks before the attack;

defendant had not been in the house since she had broken off her relationship with Coleman; and Coleman was involved with another woman at the time of the attack. The State argues that, even though the front door of the house was unlocked, there was evidence that it was difficult to shut the door so that it locked.

Here, there is no evidence that defendant lacked authority to enter the house. Even viewed in the light most favorable to the prosecution, the State's circumstantial evidence pales next to defendant's testimony that she had authority to enter the house, coupled with the circumstantial evidence of her car in the garage and her clothing in the house. Defendant's conviction for aggravated burglary is set aside.

## REFUSAL TO STRIKE JURORS FOR CAUSE

Defendant contends that the trial court abused its discretion in refusing to remove Prospective Juror 30 when questioned. That prospective juror said that approximately 3 years earlier a teen client had stolen money from her and approximately 10 years earlier a third party had tried to get someone to murder her mother. In response to the question "[A]re you gonna let those experiences impact at all on your ability to be fair to both sides in this case?" the prospective juror said, "I would say that — the second part with my mom would be difficult. I really didn't think about it till now. But I'm thinking right now it's difficult." Then she was asked "whether or not that experience is gonna make it impossible for you to be fair in this case," and she answered, "I would say it'd be extremely hard." Defense counsel requested that Prospective Juror 30 be excused for cause. The trial judge refused.

We have previously stated that the trial judge is in a better position than an appellate court to view the demeanor of prospective jurors as they are questioned. Challenges for cause are, therefore, reviewed on appeal under the abuse of discretion standard. *State v. Manning*, 270 Kan. 674, 691, 19 P.3d 84 (2001). The failure to excuse a juror for cause is not a ground for reversal unless the defendant was prejudiced as a result. *State v. Heath*, 264 Kan. 557, Syl. ¶ 17, 957 P.2d 449 (1998). Defendant asserts this standard does not apply because she was required to use a peremptory strike

to remove Prospective Juror 30. By using her first peremptory challenge on Prospective Juror 30, defendant used all of her peremptory challenges.

Peremptory challenges are a means to achieve an impartial jury, and as long as the jury that ultimately sits is impartial, the fact that the defendant had to use a peremptory challenge to achieve that result does not violate the Sixth Amendment. *Heath*, 264 Kan. 557, Syl. ¶ 17. Error is premised on defendant's assertion that "she may have removed another juror but one of her peremptory challenges was used on the prospective juror who was admittedly not fit to sit on the jury."

The State points out there was no proffer by defendant that she was unable to remove a questionable juror for lack of peremptory challenges. Therefore, defendant has shown neither an abuse of discretion in the trial judge's refusal to excuse Prospective Juror 30 for cause nor prejudice from a jury that was not impartial.

## FAILURE TO HAVE THE JURY DETERMINE HER CRIMINAL HISTORY BEYOND A REASONABLE DOUBT

Defendant's overall criminal history classification was found by the trial court to be D. Defendant argues that her sentence should not have been increased based on her prior criminal history. We rejected this argument in *State v. Ivory*, 273 Kan. 44, Syl. ¶ 1, 41 P.3d 781 (2002), holding that "*Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000), does not apply where the sentence imposed was based in part upon a defendant's criminal history score under K.S.A. 2001 Supp. 21-4704 of the Kansas Sentencing Guidelines Act." Franklin argues that *Ivory* was wrongly decided and urges the court to revisit the issue. We find there is no sound legal basis for a review of *Ivory*.

Affirmed in part and reversed in part.

LOCKETT, J., Retired, assigned.

BEIER, J., dissenting in part: I agree with my colleagues in all respects except the necessity for reversal of the defendant's aggravated burglary conviction. I therefore respectfully dissent in part.

We must decide what is essentially a sufficiency of evidence claim, viewing the evidence in the light most favorable to the State. See *State v. Davis*, 275 Kan. 107, 118, 61 P.3d 701 (2003). In addition, conviction of even the gravest crime may be supported by circumstantial evidence. See *Davis*, 275 Kan. at 118.

The majority acknowledges that several pieces of circumstantial evidence supported the "without authority" element of aggravated burglary. Because this court is not free on appeal to reweigh evidence already weighed by the trier of fact, see *State v. Mays*, 277 Kan. 359, 363, 85 P.3d 1208 (2004), I would hold this circumstantial evidence sufficient to affirm the jury's verdict on this count.

McFARLAND, C.J., and LUCKERT, J., join in the foregoing dissent.