IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 110,040

STATE OF KANSAS,
*Appellee*,

v.

JASON ROBINSON,
*Appellant*.

SYLLABUS BY THE COURT

Defendant who alleged that his statutory speedy trial rights were violated and that cumulative error deprived him of a fair trial is not entitled to reversal of his convictions because his statutory speedy trial rights were not violated; the State presented sufficient evidence of aggravated burglary; the jury instructions were proper; and any error was harmless beyond a reasonable doubt.

Review of the judgment of the Court of Appeals in an unpublished opinion filed February 13, 2015. Appeal from Wyandotte District Court; THOMAS L. BOEDING, judge. Opinion filed August 11, 2017. Judgment of the Court of Appeals affirming the district court is affirmed. Judgment of the district court is affirmed.

*Randall L. Hodgkinson*, of Kansas Appellate Defender Office, argued the cause and *Ashley R. Iverson,* legal intern*,* was with him on the brief for appellant.

*Christopher L. Schneider*, assistant district attorney, argued the cause, and *Jerome A. Gorman,* district attorney, and *Derek Schmidt,* attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

STEGALL, J.:  On August 24, 2010, an argument between Jason Robinson and his girlfriend, L.C., at her home escalated into violence. The parties presented conflicting

1

accounts at trial—L.C. testified that Robinson kicked in the door and struck her in the face. Robinson claimed that L.C. broke the door and he acted in self-defense. The State presented substantial evidence of abuse, as well as corroborating testimony from a responding officer and the treating physician. However, L.C. recanted some statements she made to law enforcement. Ultimately, the jury convicted Robinson of aggravated burglary, aggravated battery, and criminal damage to property.

On appeal, Robinson claims that seven errors—arising from all stages of the trial—warrant reversal either standing alone or cumulatively. However, we conclude that Robinson's statutory speedy trial rights were not violated; the State presented sufficient evidence of aggravated burglary; and the "bodily harm" jury instruction was not erroneous. Though the district court failed to give a K.S.A. 60-455 limiting instruction and issued written responses to the deliberating jury's questions, these errors were harmless. Robinson's remaining challenges are unpreserved. Finding no cumulative error, we affirm Robinson's convictions.

FACTUAL AND PROCEDURAL BACKGROUND

Between February and August 2010, Robinson lived intermittently with his girlfriend, L.C., and their children. On August 24, 2010, Robinson and L.C. had an argument, and Robinson left the house. The accounts given of the ensuing violence were very different. L.C. claimed that she refused to let Robinson back inside and pushed a couch against the door to prevent his entry, to no avail. Robinson kicked in the door and struck her in the face. Robinson, though, claimed self-defense, alleging that he went peacefully inside to pack his things when L.C. attacked him with a knife.

When Robinson left the house, L.C. called the police. While L.C. was on the phone with the police, Robinson returned, threw bricks through the windows of her minivan, and left again. When Officer Michael Moulin arrived at the scene, he observed

that L.C.'s minivan was damaged, her front door "had been kicked in," and L.C. was "crying, angry, and hysterical." He noticed that L.C. "had a swollen right eye and blood on her nose." He also found a couch pushed up against the front door. The police offered L.C. medical treatment, but she declined.

After the police left, L.C. noticed that her right eye kept swelling. The next day, a caseworker took L.C. to the hospital because L.C. was unable to drive herself—her windshield was broken and she could not see out of her right eye. At the hospital, emergency physician Dr. Matthew Robbinett examined L.C.'s right eye. In his deposition, Dr. Robbinett explained that L.C. sustained an orbital wall fracture and a corneal abrasion, which could cause infection or permanent double vision and require surgery. Dr. Robbinett said L.C. told him that her baby's father hit her. He recalled that the nurse's notes showed L.C. had a history of abuse and was struck with a fist or gun. He also noted that L.C. had signs of an "old infarct," which was "probably a remote injury."

The State charged Robinson with aggravated burglary, aggravated battery, aggravated assault, and felony criminal damage to property. Robinson waived formal arraignment at his probable cause hearing on October 28, 2010. The trial was initially set for January 10, 2011. On that date, the district court granted Robinson's request for a continuance to analyze his jail calls and rescheduled the trial for February 22, 2011.

The week before trial, the State moved for a continuance, asserting that Dr. Robbinett—the only physician who diagnosed and treated L.C.'s eye injury—was a material witness who would be unavailable on the second trial date because he would be working on a traveling rotation in Pittsburg, Kansas, at that time. On February 17, 2011, the district court held a hearing on the motion. The State explained that the hospital system had delayed delivery of the subpoena to Dr. Robbinett; the State was unable to conduct a deposition before trial because Dr. Robbinett was already in Pittsburg on this rotation; and the State needed Dr. Robbinett to provide evidence of the bodily harm

3

element of aggravated battery. The State assured the court that it would obtain Dr. Robbinett's schedule for the next month.

Robinson generally objected to the continuance but did not contest Dr. Robbinett's materiality or unavailability. The district court granted the State's motion, and Dr. Robbinett was later deposed to accommodate the third and final trial date, April 25, 2011.

On the morning of trial, the court heard motions in limine. The subject of much debate was the admissibility of Robinson's jail calls to L.C. in which he told her not to come to court. Robinson objected to admission of the jail calls, citing a lack of foundation and a violation of K.S.A. 60-455. The court ruled that the calls would be admissible if the foundation was laid "not pursuant to 60-455 but simply to show that the defendant's trying to persuade a critical witness from testifying in this case and that's the only purpose."

Robinson also moved to redact portions of Dr. Robbinett's deposition testimony. First, Robinson argued that L.C.'s statement to Dr. Robbinett, "[M]y baby's father hit me," was irrelevant and constituted inadmissible hearsay. Second, Robinson argued that Dr. Robbinett's references to L.C.'s "historic injuries" that he observed violated K.S.A. 60-455 because the jury could infer that Robinson caused them. The court denied both motions, concluding that the medical records were not hearsay and Dr. Robbinett's only testimony regarding a historic injury—"an old infarct," which was "probably a remote injury"—was not prejudicial to Robinson.

Finally, Robinson moved to dismiss the case on statutory speedy trial grounds, claiming that the State's continuance counted against the State and therefore the 90-day statutory speedy trial deadline had expired. The court disagreed, concluding that "this is a material witness continuance and so the record will speak for itself, but the motion to dismiss for a violation of speedy trial is denied."

4

At trial, the State called L.C. and Officer Michael Moulin as witnesses and played Dr. Robbinett's deposition video for the jury. L.C. testified that on August 24, 2010, she and Robinson had an argument, and Robinson left the house. When Robinson returned and knocked on the door that night, she refused to let him inside. Robinson started banging on the door, and L.C. was scared. L.C. recalled that she tried to push a couch against the door to bar Robinson's entry, but he kicked in the door. When the two began to argue, Robinson beat L.C. with his fists and struck her in the face. The State entered photos into evidence that showed L.C.'s swollen eye and a large bruise on her arm.

However, L.C. recanted certain statements she made to law enforcement. For example, L.C. first told police that Robinson choked her, pulled her hair, hit her with a stick, and put a gun to her head and said, "Bitch, I will kill you." At trial, L.C. said she lied about those details and exaggerated her story to the police because she was mad at Robinson. L.C. also testified that she never told the doctor that her baby's father hit her— even though Dr. Robbinett stated otherwise in his deposition.

Defense counsel asked L.C. if she ever told the State that she lied to the police. L.C. responded that yes, she did, but the State did not believe her. L.C. explained that her kids were removed from her home after she made her original police report. She claimed that someone from the "DA's office" said the State would use L.C.'s original story and threatened that L.C.'s kids would not return home and L.C. could get "locked up." L.C. admitted that she had a battery conviction against Robinson and previously had threatened him with a knife. She testified that she went to get a knife that night when Robinson was hitting her.

Before playing Dr. Robbinett's deposition video for the jury, the court asked defense counsel whether he wished to put anything on the record, but he proffered nothing. Defense counsel also lodged no contemporaneous objections while the

5

deposition video was played. However, when the deposition was taken, the defense objected on hearsay grounds to Dr. Robbinett's statement that L.C. told him, "My baby's father hit me."

After the State rested, the defense moved for a judgment of acquittal. The court granted the motion for the aggravated assault count, reduced the criminal damage count to a misdemeanor, and denied the motion for the remaining counts.

The defense called Robinson as its only witness. Robinson testified that on August 24, 2010, he got into an argument with L.C. and left the house for a few hours. When he returned home, L.C. was angry and started hitting him. Robinson explained that he tried to pack up his things, but L.C. threatened him with a knife. He managed to lock L.C. outside, but she broke in the door. However, Robinson later testified that the door was broken the week before.

Robinson said he was scared because L.C. had attacked him with a knife before. He testified that when L.C. got back into the house, she charged at him with the knife again. He claimed that he threw a bag at L.C. to dislodge the knife, and she "got the bruise on her arm from me hitting and pulling her arm trying to get the knife out of her hand." He recounted that he escaped by tossing L.C. over the couch and running out the door. Robinson showed the jury a scar on his back, claiming he incurred scratches from the fight but did not seek medical attention.

The State asked Robinson, "[D]id you ever contact [L.C.] and tell her not to come to court?" Defense counsel objected that the State was soliciting evidence of other bad acts. The court overruled the objection, stating that "this all goes to credibility of the defendant as a witness." However, defense counsel did not request a limiting instruction, and the court did not give one.

6

Robinson responded that he told L.C. not to come to court because people were threatening her. With this admission, the State did not enter the jail calls into evidence. Robinson further admitted that he threw bricks through L.C.'s car windows.

The jury found Robinson guilty of aggravated burglary, aggravated battery (bodily harm), and misdemeanor criminal damage to property. The district court sentenced Robinson to a total of 114 months' imprisonment. The Court of Appeals affirmed, holding the trial court erred when it provided written answers to the jury's deliberation questions and failed to give a limiting instruction concerning Robinson's testimony that he told L.C. not to come to court, but such errors were harmless. *State v. Robinson*, No. 110,040, 2015 WL 770167, at *14-15 (Kan. App. 2015) (unpublished opinion). We granted Robinson's petition for review.

ANALYSIS

1. *Robinson's statutory speedy trial rights were not violated.*

Robinson contends that his statutory speedy trial rights were violated because the district court erroneously granted the State a continuance for Dr. Robbinett as an unavailable material witness under K.S.A. 22-3402(5)(c), which extended the State's statutory speedy trial deadline by another 90 days. Robinson does not contest that Dr. Robbinett was material to the case. Instead, he claims for the first time on appeal that the district court erred by finding Dr. Robbinett was unavailable for trial because the State demonstrated at most an inconvenience, which is insufficient to prove unavailability. Robinson argues that, were it not for this continuance—and the 90-day extension it triggered—the statutory speedy trial deadline would have expired before he was tried.

We pause to note that, during the pendency of this appeal, the statutory speedy trial deadline was extended from 90 to 150 days. L. 2014, ch. 139, sec. 5. However, we

7

need not resolve the question of K.S.A. 2016 Supp. 22-3402(a)'s retroactivity today. Because we find no abuse of discretion, Robinson's statutory speedy trial rights were not violated under the 90-day—let alone the 150-day—period. Therefore, for purposes of this appeal, we will assume that the 90-day deadline applies.

We review a district court's decision to grant a continuance under K.S.A. 22-3402(5) for abuse of discretion. *State v. Dobbs*, 297 Kan. 1225, 1232-33, 308 P.3d 1258 (2013). "'A district court abuses its discretion if its decision is (1) arbitrary, fanciful, or unreasonable; (2) based on an error of law; or (3) based on an error of fact.'" *State v. Sherman*, 305 Kan. 88, 119, 378 P.3d 1060 (2016) (quoting *State v. Moore*, 302 Kan. 685, 692, 357 P.3d 275 [2015]). Robinson bears the burden to establish that an abuse of discretion occurred. *Dobbs*, 297 Kan. at 1232-33.

K.S.A. 22-3402 states, in relevant part:

"(1) If any person charged with a crime and held in jail solely by reason thereof shall not be brought to trial within 90 days after such person's arraignment on the charge, such person shall be entitled to be discharged from further liability to be tried for the crime charged, unless the delay shall happen as a result of the application or fault of the defendant, or a continuance shall be ordered by the court under subsection (5).

. . . .

"(5) The time for trial may be extended beyond the limitations of subsections (1) and (2) for any of the following reasons:

. . . .

(c) There is material evidence which is unavailable; that reasonable efforts have been made to procure such evidence; and that there are reasonable grounds to believe that such evidence can be obtained and trial commenced within the next succeeding 90 days.

> Not more than one continuance may be granted the state on this ground, unless for good
> cause shown, where the original continuance was for less than 90 days, and the trial is
> commenced within 120 days from the original trial date."

The State has the obligation "to ensure that a defendant is provided a speedy trial within the statutory limits," and "[a] defendant is not required to take any affirmative action to see that his or her right to a speedy trial is observed." *State v. Vaughn*, 288 Kan. 140, 144, 200 P.3d 446 (2009); see *State v. Sievers*, 299 Kan. 305, 307-08, 323 P.3d 170 (2014). "The speedy trial clock is triggered at arraignment," including waiver of arraignment. 299 Kan. at 307; see *State v. Welch*, 212 Kan. 180, 181, 509 P.2d 1125 (1973) (finding the defendant's waiver of arraignment triggered the speedy trial statute); *State v. Montgomery*, 34 Kan. App. 2d 549, 553-54, 122 P.3d 392 (2005) (holding that "when a defendant purposefully waives arraignment . . . the waiver is an effective substitute for the arraignment and there is no need for further arraignment proceedings to begin the running of the speedy-trial clock"). Generally, the days between arraignment and the next event are assessed against the State. See *State v. Thomas*, 291 Kan. 676, 694, 246 P.3d 678 (2011); *Vaughn*, 288 Kan. at 147.

However, "delays which result from the defendant's application or fault are not counted in computing the statutory period," including delays from a continuance granted at the defendant's request. *State v. Brown*, 283 Kan. 658, 662, 157 P.3d 624 (2007); see *State v. Adams*, 283 Kan. 365, 369, 153 P.3d 512 (2007) (holding that "a defendant waives his or her statutory right to a speedy trial by requesting or acquiescing in the granting of a continuance"). When a defendant causes a delay by requesting a continuance, "the appropriate commencement date for computing the delay . . . [is] the date the motion for continuance was granted." *Brown*, 283 Kan. at 666.

When a district court grants the State a continuance pursuant to K.S.A. 22-3402(5)(c), the 90-day extension period is counted from the date of the trial setting. See

9

*State v. White*, 275 Kan. 580, 601, 67 P.3d 138 (2003) (construing identical language from a prior version of K.S.A. 22-3402 to hold that the 90-day period for an unavailable material witness continuance "is counted from the date of the trial setting, not from the date on which the motion to continue was granted"). "[D]elays attributable to court-ordered continuances authorized under K.S.A. 22-3402(5) are not counted against the State in computing the 90-day period" to bring a defendant to trial. *Dobbs*, 297 Kan. at 1233.

In this case, the speedy trial clock began to run on October 28, 2010, when Robinson waived formal arraignment at his probable cause hearing. On Robinson's first trial date, January 10, 2011, the district court granted Robinson a continuance to analyze his jail calls and set the second trial date for February 22, 2011. Thus, 74 days passed from October 28, 2010, to January 10, 2011, which are assessed against the State.

However, on February 17, 2011, the court granted the State's motion to continue the case because it found that Dr. Robbinett was an unavailable material witness. Because K.S.A. 22-3402(5)(c)'s 90-day extension period is counted from the date of the trial setting, the State's extension began on February 22, 2011. The court set the third and final trial date for April 25, 2011. Between February 22, 2011, and April 25, 2011, 62 days expired—well within the State's 90-day extension period.

If the district court correctly granted the State a continuance under K.S.A. 22-3402(5)(c), then the statutory speedy trial clock never resumed running against the State after Robinson's continuance was granted on January 10, 2011, meaning only 74 days would be assessed against the State. However, if the district court erred in granting the State's continuance, then the clock also ran against the State from February 22, 2011, to April 25, 2011. Consequently, a total of 136 days would be assessed against the State— well over the speedy trial 90-day limit.

In its motion for a continuance, the State argued that (1) Dr. Robbinett was a material witness because, as L.C.'s treating physician, he was essential to prove the great bodily harm element of aggravated battery and (2) he was unavailable because of a traveling rotation in Pittsburg, Kansas. At the hearing on the motion, the State explained:

> "I got a phone call this week from Dr. Robinett [*sic*] who was the emergency room doctor, the treating physician of the victim in this case and he told me that he just had gotten the subpoena. I guess the hospital system that he works for, it has to go through various channels before it gets to him and that he just received it late last week or early this week. Anyway, he called me and told me that he's unavailable for trial next week. He's doing a traveling rotation and he'll be working in Pittsburg, Kansas next week. I asked him if he would be able to get in this week so that we could do a deposition and he told me that he's in Pittsburg now, that he would be there throughout the rest of this week and then next week. He is to e-mail me his schedule . . . they only do their schedules up to 30 days in advance so he told me he had a schedule through March, but that was it. He was to e-mail that to me. He has not as of yet. But I do, as the motion states, I do need him to prove one of my elements of aggravated battery, which is great bodily harm, as he was the diagnosing and treating physician of the victim."

Defense counsel responded, "Judge, the defendant objects to any continuance. We're prepared to go to trial next week." The district court asked defense counsel, "[I]s there anything more that you want to say on the issue of whether or not Dr. Robinett [*sic*] is a material witness?" Defense counsel replied, "Not really, Judge. The—I just got this motion yesterday. . . . As far as material witness . . . I do have information that this was the treating physician at the emergency room and I believe the only physician that the victim saw in this case." The court concluded:

> "Well, the court would find that the doctor under the circumstances as has been stated here today is a material witness in this case and the court notes further that the defendant has been granted a continuance of the trial in this matter and the court will grant . . . the State's motion to continue this trial."

11

On appeal, Robinson only contests Dr. Robbinett's unavailability. He relies on *State v. George*, 31 Kan. App. 2d 430, 65 P.3d 1060 (2003), to argue that the State failed to demonstrate that Dr. Robbinett was unavailable because the record shows, at most, that returning for trial might have been inconvenient for Dr. Robbinett. In *George*, the Court of Appeals held that two officers were not "unavailable" for trial because:

> "In requesting the continuance, the State simply alleged, without explanation, that the two officers were unavailable because they planned to be out of state on the October trial dates. This was insufficient to demonstrate the necessity of a continuance. There was no showing as to the purpose of the officers' out-of-state trip or whether it could be rescheduled. Was it for necessary official duty or merely pleasure? There was no evidence as to whether the court's trial calendar contained a civil trial that could be rescheduled to accommodate the time constraints for the speedy trial. There appeared to have been no consideration of the possibility of having an assigned judge hear this trial." 31 Kan. App. 2d at 434-35.

In contrast, the State detailed why Dr. Robbinett was unavailable—because the subpoena was inadvertently delayed and Dr. Robbinett was already on a traveling rotation in Pittsburg, Kansas, that would last through the trial date. As the Court of Appeals observed, "to expect a traveling doctor to reschedule appointments or obtain coverage is not a mere inconvenience, either to the doctor or, even more so, to his or her patients." *Robinson*, 2015 WL 770167, at *4.

Yet, we echo *George*'s concern that we "need to have evidence in the record to determine the basis and propriety of the court's continuance." 31 Kan. App. 2d at 434. Indeed, the record here is slim—the State presented no evidence to substantiate its claim that Dr. Robbinett was unavailable due to his traveling rotation. We caution that the better practice would be to present evidence in support of a request for a K.S.A. 22-3402(5)(c) continuance. See K.S.A. 60-402; *State v. Page*, 303 Kan. 548, 556, 363 P.3d 391 (2015) ("K.S.A. 60-402 establishes a general requirement for application of Kansas

12

evidentiary rules in all proceedings unless exempted elsewhere."). But despite the meager record before us, Robinson's claim is unpreserved.

Robinson did not contest Dr. Robbinett's unavailability in district court, which perhaps encouraged the scant record here. Though Robinson generically objected to a continuance, he did not provide a reason—let alone contest unavailability—even when offered the opportunity to do so. Failing to contest unavailability in district court and cite a preservation exception on appeal is fatal to Robinson's claim. See *State v. Dunn*, 304 Kan. 773, 817, 375 P.3d 332 (2016) ("Ordinarily a party that wants to pursue an issue on appeal must have preserved that issue in the court below."); *State v. Godfrey*, 301 Kan. 1041, 1043, 350 P.3d 1068 (2015) ("an exception must be invoked by the party asserting the claim for the first time on appeal"); Supreme Court Rule 6.02(a)(5) (2017 Kan. S. Ct. R. 35) ("If the issue was not raised below, there must be an explanation why the issue is properly before the court.").

Accordingly, we hold that the district court did not abuse its discretion when it granted the State a continuance for an unavailable material witness and therefore Robinson's statutory speedy trial rights were not violated.

2. *The evidence was sufficient to convict Robinson of aggravated burglary.*

Robinson argues that the State presented insufficient evidence of aggravated burglary because, as a cohabitant, he had authority to enter the house. The Court of Appeals held that, viewing the evidence in a light most favorable to the State, a reasonable juror could conclude that Robinson lacked authority to enter the home. *Robinson*, 2015 WL 770167, at *7. We agree and affirm Robinson's aggravated burglary conviction.

"When the sufficiency of the evidence is challenged in a criminal case, this court reviews the evidence in a light most favorable to the State to determine whether a rational factfinder could have found the defendant guilty beyond a reasonable doubt." *State v. McBroom*, 299 Kan. 731, 754, 325 P.3d 1174 (2014). "Appellate courts do not reweigh evidence, resolve evidentiary conflicts, or make witness credibility determinations." *State v. Daws*, 303 Kan. 785, 789, 368 P.3d 1074 (2016). Additionally, this court makes no distinction between circumstantial and direct evidence in terms of probative value because "'[a] conviction of even the gravest offense can be based entirely on circumstantial evidence and the inferences fairly deducible therefrom. If an inference is a reasonable one, the jury has the right to make the inference.'" *McBroom*, 299 Kan. at 754 (quoting *State v. McCaslin*, 291 Kan. 697, Syl. ¶ 9, 245 P.3d 1030 [2011]).

At the time of Robinson's offense, aggravated burglary was defined as

"knowingly and *without authority* entering into or remaining within any building, manufactured home, mobile home, tent or other structure, or any motor vehicle, aircraft, watercraft, railroad car, or other means of conveyance of persons or property in which there is a human being, with intent to commit a felony . . . therein." (Emphasis added.) K.S.A. 21-3716.

At trial, the jury heard conflicting testimony regarding Robinson's authority to enter the house. L.C. testified that she moved into the house in February 2010, and Robinson lived with her "[w]hen he chose to." L.C. estimated that Robinson lived with her for about a month prior to the incident. However, L.C. was the only person on the lease, and Robinson had no key to the home. L.C. stated that when Robinson returned to the house on August 24, 2010, she did not give Robinson permission to enter the house and attempted to bar his entry by moving a couch in front of the door.

Robinson testified that he lived with L.C. on and off for about 5 years. He claimed that he kept things in her house, but the record is unclear to what extent. On appeal,

14

Robinson argues that L.C.'s refusal to grant him permission to enter is not determinative of his authority to enter. He also contends that the evidence shows he was a cohabitant who had authority to enter the home. However, both cases Robinson cites in support are distinguishable from the facts of this case.

Robinson is correct that a lack of permission does not automatically equate to a lack of authority, but his analogy to *State v. Vasquez*, 287 Kan. 40, 194 P.3d 563 (2008), is unconvincing. In *Vasquez*, the defendant argued that the evidence was insufficient to convict him of aggravated burglary because he had authority to enter the house he and the victim—his wife—shared. While Vasquez was in Mexico, his wife sought a divorce and told him not to return home. We concluded that the evidence was insufficient to convict Vasquez of aggravated burglary, distinguishing between permission and authority to enter:

> "[T]he State certainly demonstrated that [Vasquez' wife] wanted nothing to do with Vasquez. She had asked him to stay in or go back to Mexico; and she had moved at least some of his belongings out of their house and into his sister's. Yet the State did not prove that . . . Vasquez was legally unauthorized to enter the house he and [his wife] had lived in together. [She] may have obtained a restraining order or may have planned to file a PFA action . . . but there was no evidence that Vasquez had been served with any order of this type. He was still married to [her]." 287 Kan. at 60.

In contrast, because Robinson and L.C. were not married at the time of the incident, their relationship status did not authorize Robinson's entry. Rather, they were at most cohabitants, making L.C.'s refusal to grant Robinson permission relevant to, but not determinative of, the fact-intensive question of Robinson's authority to enter the house.

Robinson also relies on *State v. Franklin*, 280 Kan. 337, 121 P.3d 447 (2005), to argue that he had authority to enter the house despite his on-and-off cohabitation with L.C. In *Franklin*, the defendant argued that she had authority to enter her ex-boyfriend's

15

house, where she had lived for a year and a half. The defendant testified that she had permission from her ex-boyfriend and his mother to be in that house; that she stored a car in the garage; and that she kept clothes in the house. The State did not rebut this testimony. Instead,

> "[t]he State relied on the following circumstantial evidence to prove aggravated burglary: the attack occurred at 1:54 a.m. when the occupants of the house were sleeping; the defendant did not speak to anyone in the house during the attack; defendant had not been seeing [her ex-boyfriend] for several weeks before the attack; defendant had not been in the house since she had broken off her relationship . . . and [her ex-boyfriend] was involved with another woman at the time of the attack." 280 Kan. at 345-46.

We determined that there was no evidence the defendant lacked authority to enter the house because "the State's circumstantial evidence pales next to defendant's testimony that she had authority to enter the house, coupled with the circumstantial evidence of her car in the garage and her clothing in the house." 280 Kan. at 346.

However, L.C. testified that she did not give Robinson permission to enter the house. In word and deed, L.C. clearly communicated her refusal to grant Robinson access to the house—she told him to leave and pushed a couch against the door. Without a key, Robinson lacked access to L.C.'s home without her consent, as evidenced by his forcible entry. Though Robinson lived with L.C. at times prior to the incident and kept some belongings in her home, the State presented far more rebuttal evidence here than in *Franklin*.

In sum, the evidence regarding Robinson's authority to enter the home was conflicting at best. However, we do not resolve evidentiary conflicts or assess witness credibility. See *Daws*, 303 Kan. at 789. Viewing the evidence in a light most favorable to the State, we hold that a reasonable jury could conclude Robinson did not have authority

16

to enter the house and find Robinson guilty of aggravated burglary beyond a reasonable doubt.

3. *Robinson's constitutional challenge to the aggravated battery statute is unpreserved.*

For the first time on appeal, Robinson argues that the aggravated battery statute, K.S.A. 21-3414(a)(1)(B), is unconstitutionally vague because it gives no tangible guidance on what separates simple battery from battery done whereby "great bodily harm, disfigurement or death can be inflicted." However, Robinson's claim is "subject to the general rule that alleged constitutional violations cannot be raised for the first time on appeal." *Godfrey*, 301 Kan. at 1043. The Court of Appeals declined to reach the merits because Robinson failed to preserve this challenge, and so do we. 2015 WL 770167, at *7.

Robinson acknowledges the lack of preservation but invokes two exceptions: "(1) The newly asserted claim involves only a question of law arising on proved or admitted facts and is determinative of the case," and "(2) consideration of the claim is necessary to serve the ends of justice or to prevent the denial of fundamental rights." *State v. Swint*, 302 Kan. 326, 335, 352 P.3d 1014 (2015). However, we decline the invitation to apply such exceptions here.

4. *The "bodily harm" jury instruction was not erroneous.*

Robinson argues that the "bodily harm" jury instruction directed the jury that certain circumstances are bodily harm as a matter of law for aggravated battery, which precluded the jury from finding that element beyond a reasonable doubt. However, Robinson's argument fails because the instruction's definition of "bodily harm" is firmly rooted in caselaw and reflected in the comment to PIK Crim. 3d 56.18 (2009 Supp.). Therefore, we hold that the bodily harm instruction was not erroneous.

17

When a jury instruction is alleged to be erroneous,

"(1) [f]irst, the appellate court should consider the reviewability of the issue from both jurisdiction and preservation viewpoints, exercising an unlimited standard of review; (2) next, the court should use an unlimited review to determine whether the instruction was legally appropriate; (3) then, the court should determine whether there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that would have supported the instruction; and (4) finally, if the district court erred, the appellate court must determine whether the error was harmless." *State v. Plummer*, 295 Kan. 156, 163, 283 P.3d 202 (2012).

Robinson admits that he did not object to the bodily harm instruction at trial—in fact, he agreed to it. When, as here, "the instruction error is raised for the first time on appeal, the failure to give a legally and factually appropriate instruction will result in reversal only if the failure was clearly erroneous." *State v. Solis*, 305 Kan. 55, 65, 378 P.3d 532 (2016). "To establish a clearly erroneous instruction error, the defendant must firmly convince the court the jury would have reached a different result without the error." 305 Kan. at 65.

K.S.A. 21-3414(a)(1)(A)-(B), in relevant part, defines aggravated battery as "[i]ntentionally causing great bodily harm to another person or disfigurement of another person" or "intentionally causing bodily harm to another person with a deadly weapon, or in any manner whereby great bodily harm, disfigurement or death can be inflicted." The statute does not define "bodily harm." See K.S.A. 21-3414(a)(1)(A)-(B); *State v. Cooper*, 303 Kan. 764, 771, 366 P.3d 232 (2016).

The jury instructions stated that to convict Robinson of aggravated battery, the State had to prove that Robinson intentionally caused "great bodily harm," or "bodily

18

harm . . . in any manner whereby great bodily harm, disfigurement or death can be inflicted" to L.C. Instruction 11 defined "bodily harm" as follows:

> "As used in these instructions, bodily harm has been defined as any touching of the victim against the victim's will, with physical force, in an intentional hostile and aggravated manner. The word 'great' distinguishes the bodily harm necessary to prove aggravated battery from slight, trivial, minor or moderate harm, and as such it does not include mere bruises."

This definition of bodily harm comports with caselaw and the comment to PIK Crim. 3d 56.18 (2009 Supp.). We have defined "bodily harm" as "'any touching of the victim against [the victim's] will, with physical force, in an intentional hostile and aggravated manner.'" *State v. Dubish*, 234 Kan. 708, 715, 675 P.2d 877 (1984); *State v. Livingston*, 272 Kan. 853, 859, 35 P.3d 918 (2001). Furthermore, we have defined "great bodily harm" as "more than slight, trivial, minor, or moderate harm, [that] does not include mere bruising, which is likely to be sustained by simple battery." *State v. Green*, 280 Kan. 758, 765, 127 P.3d 241 (2006); *Cooper*, 303 Kan. at 771.

Furthermore, the definition of bodily harm in the comment to PIK Crim. 3d 56.18 (2009 Supp.) is identical to instruction 11, except for one slight deviation—the comment states that "[t]he word 'great' distinguishes the bodily harm necessary to prove aggravated battery from slight, trivial, minor or moderate harm, and as such it does not include mere bruises, *which are likely to be sustained in simple battery*." (Emphasis added.)

Robinson cites *State v. Brice*, 276 Kan. 758, 80 P.3d 1113 (2003), to argue that the district court instructed the jury as a matter of law that certain circumstances constitute "bodily harm." However, *Brice* bears no resemblance to this case. In *Brice*, this court held that the district court erred when it gave a jury instruction defining "great bodily harm" as a "through and through bullet wound" because the uncontroverted evidence showed the defendant inflicted such a wound, leaving no room for the jury to find that

19

element beyond a reasonable doubt. 276 Kan. at 771. Here, the district court did not graft facts of the case into the bodily harm instruction. On the contrary, instruction 11 was legally appropriate because it "fairly and accurately state[d] the applicable law." *Plummer*, 295 Kan. at 161.

Finally, the district court's instruction was factually appropriate because the State presented a substantial amount of evidence—consisting of photographs and multiple testimonies—that L.C. sustained serious injuries to her eye, which could create permanent complications, such as double vision.

Because the instruction was legally and factually appropriate, it was not given in error.

5. *Robinson's challenges to Dr. Robbinett's testimony are unpreserved.*

Robinson argues that the district court erred when it refused to redact Dr. Robbinett's testimony that L.C. said, "My baby's father hit me," and L.C.'s physical condition "suggest[ed] an old infarct," which was "probably a remote injury." He contends that admitting these statements violated K.S.A. 60-455's prohibition against admitting evidence of another crime or civil wrong to prove the defendant's propensity to commit the charged crime. However, we need not reach the merits of these objections because Robinson failed to preserve them below.

"Generally, to preserve an evidentiary issue for appellate review, the complaining party must have lodged a timely and specific objection at trial." *State v. Dupree*, 304 Kan. 43, 62, 371 P.3d 862, *cert. denied* 137 S. Ct. 310 (2016); K.S.A. 60-404; see *Solis*, 305 Kan. at 62 ("[T]his court has shown no indication that it intends to deviate from the requirement of a contemporaneous objection at trial in order to preserve an evidentiary issue for appellate review."). Furthermore, "[e]ven when the district court rules on the

20

admissibility of evidence pretrial, a party must still make an objection at trial before the admission of the evidence because the unfolding of a case may require a reevaluation of the reasons for the initial ruling." *Dupree*, 304 Kan. at 62. This court does not allow parties "to object to the introduction of evidence on one ground at trial and then assert another ground on appeal." *State v. Race*, 293 Kan. 69, 78, 259 P.3d 707 (2011); see *State v. McCormick*, 305 Kan. 43, 47, 378 P.3d 543 (2016) (where the trial objection was for relevance, this court would not consider a prejudice argument on appeal).

We will examine each contested statement in turn. During the recording of Dr. Robbinett's deposition, Dr. Robbinett said, "she [L.C.] said she had been punched in her right eye," and Robinson immediately objected on hearsay grounds to anything that someone told the doctor. Shortly after this objection, Dr. Robbinett said L.C. told him, "My baby's father hit me." Before trial, Robinson presented a motion in limine to redact Dr. Robbinett's deposition to exclude that statement, objecting on the grounds of hearsay and relevance. Specifically, defense counsel stated, "I think the specific person that hit her is irrelevant . . . certainly hearsay." Thus, Robinson never objected to L.C.'s statement, "My baby's father hit me," on K.S.A. 60-455 grounds below. Because Robinson cannot object on one ground below and another on appeal, this claim is unpreserved. See *Race*, 293 Kan. at 78.

When Dr. Robbinett's deposition was recorded, Robinson did not object to Dr. Robbinett's statement that L.C. presented signs suggesting an old infarct, which was probably a remote injury. Before trial, Robinson presented a motion in limine to redact Dr. Robbinett's statements about any "historic injuries" he observed but did not cite to specific testimony. The State countered that the doctor only talked about an indication of a prior stroke, not a prior injury. The court asked defense counsel, assuming the State was not arguing that the defendant caused the prior stroke, how would the defendant be prejudiced? Defense counsel replied:

21

"Well, I guess my question is how does that help the jury in any way, shape or form? It certainly doesn't help them determine whether or not my client committed these acts, Judge. And when they start hearing about historic injuries, you know, that could infer that . . . my client may have something to do with it. It doesn't make any sense to allow that in if they're not even concerned about the stroke at all."

Robinson's objection is inexact but, generously construed, he appears to argue that evidence of the old infarct is irrelevant and might suggest that Robinson injured L.C. previously, which could implicate K.S.A. 60-455.

Before Dr. Robbinett's deposition video was published to the jury, the court asked if Robinson would like to put anything on the record, and he did not renew his motion in limine. When the deposition was played, Robinson did not object to Dr. Robbinett's statements. Since Robinson neither made a contemporaneous K.S.A. 60-455 objection nor renewed his motion in limine, the objection is not properly preserved for our review. See *Dupree*, 304 Kan. at 62.

6. *The district court's failure to provide a limiting instruction was harmless error.*

Robinson claims the district court committed reversible error when it admitted K.S.A. 60-455 evidence that Robinson contacted L.C. and told her not to come to court without providing a limiting instruction. Robinson argues that the error is reversible because "there is a real possibility that the jury saw this as indicative of the cycle of violence that [Robinson's] and [L.C.'s] lives revolve around and therefore found that [Robinson] is guilty." However, we agree with the Court of Appeals that "[e]ven if we find it was error not to provide a limiting instruction regarding the evidence Robinson complains about, we conclude that such an error was not clearly erroneous." *Robinson*, 2015 WL 770167, at *11.

22

"[I]n a jury trial the district court must give the jury a limiting instruction telling the jury the specific purpose for which the [K.S.A. 60-455] evidence has been admitted." *State v. Torres*, 294 Kan. 135, 140, 273 P.3d 729 (2012); see *Solis*, 305 Kan. at 65 ("Without question, where propensity evidence is not allowed, the trial court should have given a limiting instruction."). Assuming, for purposes of this appeal, that a K.S.A. 60-455 limiting instruction was appropriate and the district court erred in failing to give one, we next must review the entire record to determine if the error is reversible. See *State v. Breeden*, 297 Kan. 567, 584, 304 P.3d 660 (2013). Because Robinson did not request a limiting instruction in district court, we apply K.S.A. 2016 Supp. 22-3414(3)'s clearly erroneous standard of review. 297 Kan. at 581. "This requires us to make a de novo determination of whether we are firmly convinced the jury would have reached a different verdict had a limiting instruction been given." 297 Kan. at 584.

In prior domestic violence cases, we have found that corroborating K.S.A. 60-455 evidence that has minimal impact on the outcome of the case does not merit reversal under the clearly erroneous standard. For example, in *Solis*, a defendant convicted of murder argued that the trial court's failure to give a limiting instruction when admitting evidence of his prior batteries against the victim was reversible error. 305 Kan. at 65. However, we held that the error was not clearly erroneous because "[t]he jury heard enough other evidence of Solis' unusual behavior toward [the victim] and the couple's discordant relationship to render the challenged testimony corroborative, rather than determinative." 305 Kan. at 65. In short, the evidence of prior violence was not "a game-changer." 305 Kan. at 65.

Similarly, in *Vasquez*, we held it was not clearly erroneous to admit testimony about the defendant's previous domestic battery against the murder victim without a limiting instruction because the evidence had "minimal impact" on the case and "did not give the jury its sole or even a predominant independent reason to convict Vasquez." 287

23

Kan. at 53. We explained that a limiting instruction "would have improved Vasquez' trial, but the trial was fair and its result reliable without it." 287 Kan. at 54.

Robinson's admission that he told L.C. not to come to court was likewise corroborative of the substantial evidence of abuse and intimidation that the State presented at trial. The jury heard testimony that Robinson forced entry into L.C.'s house; he struck L.C. in the eye; he threw bricks through the windows of her minivan; the nurse's notes showed that L.C. had a history of abuse; and L.C. told the physician that her baby's father hit her. In light of this evidence, Robinson's statement at most had a "minimal impact" and was not the "sole or even a predominant independent reason" to convict him of the crimes charged. See *Vasquez*, 287 Kan. at 53. Any error in failing to give a limiting instruction was harmless.

7. *The district court's written responses to the deliberating jury's questions constitute harmless error.*

On two separate occasions during its deliberations, the jury sent written questions to the district court. Both times, the procedure followed was the same—the court discussed the questions and responses with both Robinson and his counsel; Robinson's counsel agreed to the content of the responses while Robinson was present; and the court sent written responses to the jury. Robinson's counsel did not object.

The first time, the jury asked three questions:  (1) "[W]ho took the photos [of L.C.'s injuries, car, and home]?" (2) "[W]hen were they taken?" and (3) "[D]id he state that he threw her across the bed?" With the parties' agreement, the court answered:  (1) "There was no evidence as to the photographer." (2) "The photographs were taken on August 28, 2010." and (3) "No." The second time, the jury requested, "Explain again the difference in great bodily harm and bodily harm and how intent factors in." With the parties' agreement, the court responded, "See instruction numbers 11, 7, 8, and 18."

24

Robinson argues that the written format of the responses to the jury's questions violated his constitutional rights to be present, to have a public trial, and to have an impartial judge, which constitutes reversible error. However, we affirm because (1) Robinson abandoned his arguments regarding his right to a public trial and an impartial judge and (2) assuming Robinson's right to be present was violated, such error was harmless.

As a preliminary matter, Robinson abandoned his arguments regarding his right to a public trial and impartial judge because he failed to adequately brief them. Indeed, "[w]e have repeatedly treated identical arguments, asserting the same claim without support, as akin to failing to brief the issue." *Cooper*, 303 Kan. at 768-69. For example, in *State v. Bowen*, 299 Kan. 339, 323 P.3d 853 (2014), the defendant likewise argued that his rights to a public trial and impartial judge were violated when the court sent written responses to jury questions. However, this court declined to reach the merits because "[s]imply pressing a point without pertinent authority, or without showing why it is sound despite a lack of supporting authority, is akin to failing to brief an issue; when appellant fails to brief an issue, that issue is waived or abandoned." 299 Kan. at 356; see *State v. Verser*, 299 Kan. 776, 790-91, 326 P.3d 1046 (2014) (because the defendant cited law supporting his rights to a public trial and an impartial judge in the abstract but failed to explain how the written jury communication violated them, the issues were deemed waived). Therefore, we likewise decline to entertain Robinson's unsupported arguments.

Robinson also claims that the written responses violated K.S.A. 22-3420(3), which in turn, violated his constitutional right to be present. The State does not contest the alleged error but argues only that it was harmless. As in *State v. Bolze-Sann*, 302 Kan. 198, 216, 352 P.3d 511 (2015), "[b]ecause we agree with the State that the error was harmless, we will also move directly to a harmless error review." Therefore, we will assume error and apply the constitutional harmless error standard from *Chapman v.*

*California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705, *reh. denied* 386 U.S. 987 (1967), which we have long summarized as follows:

> "[T]he error may be declared harmless where the party benefitting from the error proves beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.,* proves there is no reasonable possibility that the error affected the verdict." *State v. Ward*, 292 Kan. 541, 569, 256 P.3d 801 (2011).

Several factors are significant in determining whether this kind of assumed error is harmless beyond a reasonable doubt:

> "(1) the overall strength of the case against the defendant; (2) whether either party objected to the manner in which the judge handled the communication; (3) whether the judge's communication with the jury 'concerned a critical aspect of the trial or rather involved an innocuous and insignificant matter,' and also how the communication was conveyed to the jury; and (4) the ability of any posttrial remedy to 'mitigate the constitutional error.'" *Bolze-Sann*, 302 Kan. at 216-17 (quoting *State v. McGinnes*, 266 Kan. 121, 132-37, 967 P.2d 763 [1998]).

Considering these factors, we conclude the State proved that "there is no reasonable possibility that the error affected the verdict." *Ward*, 292 Kan. at 569. The case against Robinson was strong—the State presented ample testimony from the victim, doctor, police officer, and even Robinson for the jury to conclude beyond a reasonable doubt that Robinson broke through L.C.'s door without authority, struck L.C. in the face (causing substantial injury to her eye), and threw a brick through her car window. Though conflicting testimony was presented, we will not second-guess the jury's credibility determination and reasonable decision to believe the corroborating stories of L.C., Dr. Robbinett, and Officer Moulin over Robinson's testimony. See *Daws*, 303 Kan. at 789.

26

Furthermore, Robinson did not object to the written communication procedure or seek any posttrial remedy, even in his motion for a new trial. And, like *Bolze-Sann*, Robinson "makes no argument that the content of the district court's response was in any way prejudicial or inaccurate." 302 Kan. at 217. Indeed, the content of the responses was "entirely innocuous and insignificant." 302 Kan. at 217. The first set of questions—who took the photographs, when were the photographs taken, and whether Robinson threw L.C. across the bed—concerned basic, noncontroversial facts. For the second question, the parties agreed to refer the jury back to the relevant jury instructions—no "additional information or information of any import" was supplied. 302 Kan. at 217. The court and parties discussed each question and agreed upon each answer in Robinson's presence and with his input.

Accordingly, there is no reasonable possibility that Robinson's presence during the communication of the responses to the jury would have impacted the outcome of trial. Therefore, we hold that the State carried its burden to prove that any error was harmless beyond a reasonable doubt.

8. *Cumulative error does not merit reversal.*

Finally, Robinson alleges that cumulative error deprived him of a fair trial.

"When faced with a cumulative error claim, this court conducts an unlimited review of the entire record to determine whether the totality of the circumstances establishes that the cumulative effect of trial errors substantially prejudiced the defendant and denied the defendant a fair trial." *State v. Stewart*, 306 Kan. 237, 265, 393 P.3d 1031 (2017). However, "if any of the errors being aggregated are constitutional in nature, the cumulative error must be harmless beyond a reasonable doubt." *State v. Tully*, 293 Kan. 176, Syl. ¶ 18, 262 P.3d 314 (2011).

27

We assumed two errors in this case: (1) the district court admitted Robinson's statement that he told L.C. not to come to court without a limiting instruction, and (2) the district court provided written responses to the deliberating jury's questions in violation of Robinson's constitutional right to be present. Because the evidence against Robinson was strong, any such errors, even when combined, are harmless beyond a reasonable doubt. See 293 Kan. at 205-06 (considering the strength of the evidence in a cumulative error analysis).

Affirmed.