NOT DESIGNATED FOR PUBLICATION

Nos. 120,523
120,524

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Matter of
V.B.

MEMORANDUM OPINION

Appeal from Johnson District Court; THOMAS E. FOSTER, judge. Opinion filed September 27, 2019. Affirmed.

*Jacob M. Gontesky*, assistant district attorney, *Stephen M. Howe*, district attorney, for appellant.

*Michael J. Bartee*, of Michael J. Bartee, P.A., of Olathe, for appellee.

Before STANDRIDGE, P.J., PIERRON and ATCHESON, JJ.

PER CURIAM: The State appeals the district court's denial of its motion to waive V.B. to adult status for prosecution.

FACTS

On February 12, 2018, the State charged V.B. with theft of a firearm in case No. 18JV198. During the pendency of the theft charge, on May 31, 2018, the State charged him with attempted second-degree murder in case No. 18JV665. Four days later, the State moved to waive V.B. to adult status for prosecution in 18JV665. On June 27, the State moved to waive V.B. to adult status for prosecution in 18JV198. The State amended the complaint in 18JV665 to include charges for attempted aggravated robbery and possession of marijuana on December 4, 2018.

1

On December 7, 2018, the district court heard the motions. The court took judicial notice of 14JV1218, 14JV1474, 17JV1516, 18JV198, 18JV665, and 17JC662. The State's first witnesses testified about the facts in 18JV665. Shawnee Police Officer David Brandau testified he responded to a call for shots fired on May 25, 2018. The call was upgraded to a call for a person shot. When he arrived, he saw a vehicle disabled in the roadway with multiple bullet holes and the victim sitting on the ground with a bullet wound to his left torso. Brandau later obtained a warrant and searched V.B.'s residence. In the furnace closet, he found a bag containing a jar of marijuana, a spare magazine to a handgun, baggies, and a 9 mm Smith & Wesson handgun. Brandau confirmed there was no indication of who owned the gun. However, Dustin Calvin, forensic scientist at the Johnson County Crime Lab latent print section, testified he had recovered V.B.'s fingerprint on the slide of the handgun as well as on the jar containing marijuana.

In preparation for the waiver hearing, Laura Brewer, chief court services officer, reviewed police reports, lab reports, and photographs for the two pending cases. She also reviewed the case files of V.B.'s previous court involvement for both juvenile delinquency and child in need of care (CINC) cases. She reviewed performance reports from the juvenile detention center (JDC); his psychological evaluation; and school records, including his individualized education program (IEP). She interviewed V.B. in July 2018.

The State focused Brewer's testimony on the eight factors in K.S.A. 2018 Supp. 38-2347(d), which a district court must consider when determining whether to waive a juvenile to adult status for prosecution:

> "(1) The seriousness of the alleged offense and whether the protection of the community requires prosecution as an adult or designating the proceeding as an extended jurisdiction juvenile prosecution;

2

"(2) whether the alleged offense was committed in an aggressive, violent, premeditated or willful manner;

"(3) whether the offense was against a person or against property. Greater weight shall be given to offenses against persons, especially if personal injury resulted;

"(4) the number of alleged offenses unadjudicated and pending against the juvenile;

"(5) the previous history of the juvenile, including whether the juvenile had been adjudicated a juvenile offender under this code or the Kansas juvenile justice code and, if so, whether the offenses were against persons or property, and any other previous history of antisocial behavior or patterns of physical violence;

"(6) the sophistication or maturity of the juvenile as determined by consideration of the juvenile's home, environment, emotional attitude, pattern of living or desire to be treated as an adult;

"(7) whether there are facilities or programs available to the court which are likely to rehabilitate the juvenile prior to the expiration of the court's jurisdiction under this code; and

"(8) whether the interest of the juvenile or of the community would be better served by criminal prosecution or extended jurisdiction juvenile prosecution.

"The insufficiency of evidence pertaining to any one or more of the factors listed in this subsection, in and of itself, shall not be determinative of the issue. Subject to the provisions of K.S.A. 2018 Supp. 38-2354, and amendments thereto, written reports and other materials relating to the juvenile's mental, physical, educational and social history may be considered by the court."

Of the eight factors for consideration, Brewer testified that only the second and third, which are specific to the alleged offenses, supported waiver. She stated five of the remaining six factors favored extended juvenile jurisdiction prosecution (EJJP). As for the sixth factor, she stated it did not support waiver, but she did not clarify if it supported EJJP or standard juvenile jurisdiction.

V.B.'s witnesses focused on factors related to his abilities and personality rather than the offense-specific factors. Dr. Todd Shimmel, psychologist at Johnson County

3

Mental Health testified V.B.'s intellectual functioning was in the lower one percentile for his age range and, socially, he tended to be a follower and pleaser. Jeff Goss, who coached V.B. in basketball at Lenexa Baptist Church, testified he knew V.B. had challenges at home and V.B. had shown some maturity in that he appeared to have to make a lot of his own decisions. He also viewed V.B. sitting through devotion time before basketball, rather than goofing off like many other players, as a sign of maturity.

Tracy Mays, V.B.'s maternal aunt, stated he had lived with her since March 2018. Before that, he lived with his mother and six siblings. V.B. was close with his younger brother, who was the leader of the two. Tracy stated V.B. had always been a follower and had gotten into trouble in the past because he followed the wrong people. She stated V.B.'s mother passed away on May 4, 2018, and shortly thereafter his half sister from his father's side was found dead. Shelby Coleman, KVC Behavioral Healthcare adoption case manager, testified she had been working with V.B. since August 2018 and had a good relationship with him. She stated she generally had to explain things to V.B. more than once and was not sure if he fully understood what she was saying. She testified his level of sophistication and maturity was below that of the average 16-year-old.

Rex Arthur, JDC case manager, testified V.B. had been in JDC for 192 days. He had received eight behavioral reports in that time, three of which occurred in his first six weeks at the facility. V.B.'s last report had been on September 28, 2018. He testified V.B.'s behavior had significantly improved, and he had even received at least three ACE awards for being the best-behaved resident during those weeks.

The district court considered the factors and found that V.B. was alleged to have committed a very serious violent offense against a person that resulted in injury. The court appeared to have been neutral regarding the fourth factor as it noted V.B. could have had less or could have had more unadjudicated offenses. It found he had only been adjudicated for two misdemeanors. In its consideration for the sixth factor, the court

4

found a long history of investigations by the Department for Children and Families (DCF). The court considered Dr. Shimmel's psychological evaluation, which indicated V.B. was not as mature as others his age and Arthur's report that V.B. had demonstrated his ability to improve in a structured environment. The court found a history of neglect in V.B.'s home environment and no evidence to support a pattern of living as an adult or the desire to be treated as an adult. The court held that the facilities and programs available in the juvenile system were more appropriate for V.B. and, in weighing the community's safety interests in a longer sentence in the adult system against the increased likelihood of rehabilitation in the juvenile system, the court found the State had failed to meet its burden to show V.B. should be waived to adult status for prosecution. The court denied the State's motion. The State appeals.

ANALYSIS

The State claims the district court's factual findings as to the first four factors were supported by substantial evidence and the legal conclusion that each of those factors supported waiver was not an abuse of discretion. However, it contends the district court's factual findings as to the fifth through eighth factors were not supported by substantial evidence and the court based its ultimate legal conclusion on errors of fact and unreasonable interpretations of law.

V.B. contends the district court's fact-finding was based on substantial evidence and the State is asking us to make different findings of fact which permit it to draw inferences in its favor. He claims the State misconstrued the court's findings as to the first factor by limiting its findings to the first element of the factor. V.B. claims the court made a negative finding as to the second element. He agrees with the State's assertion that the court found the second and third factors favored waiver. However, he claims the district court's findings as to the fourth through eighth factors were supported by substantial evidence and in favor of EJJP.

5

When reviewing a district court's determination of whether to waive a juvenile to adult status for prosecution, an appellate court determines whether the district court's factual findings are supported by substantial evidence. *In re D.D.M.*, 291 Kan. 883, 892-93, 249 P.3d 5 (2011). Substantial evidence is "evidence which possesses both relevance and substance and which furnishes a substantial basis of fact from which the issues can reasonably be resolved." 291 Kan. at 893 (citing *State v. Mays*, 277 Kan. 359, 363, 85 P.3d 1208 [2004]). We must accept the evidence and all inferences to be drawn from it that support the district court's findings as true and give deference to its evaluation or characterization of the facts. *D.D.M.*, 291 Kan. at 893.

Appellate courts review the district court's determination of whether to waive the juvenile status using the abuse of discretion standard. 291 Kan. at 893. Though the district court must have considered the eight statutory factors, it was not constrained by the insufficiency of the evidence to support one or more of the factors. 291 Kan. at 893. Judicial discretion is abused if judicial action is (1) arbitrary, fanciful, or unreasonable; (2) based on an error of law; or (3) based on an error of fact. *State v. Ward*, 292 Kan. 541, 550, 256 P.3d 801 (2011).

The parties agree with the district court's factual findings that V.B. was accused of violent person offenses in which a person had been injured. The parties agree with the conclusions that the second and third factors favored a waiver. Thus, we need not review them individually.

*Factor One*

K.S.A. 2018 Supp. 38-2347(d)(1) considers the seriousness of the alleged offense and whether the protection of the community requires prosecution as an adult or designating the proceeding as an extended jurisdiction juvenile prosecution.

6

Here, the district court found the first factor was the severity level of the crime and the seriousness of the alleged offense. The most serious offense was a level 3 felony— use of a handgun, the shooting, and an injury. The court found it was one of the more serious types of crimes that can be committed.

The State had charged V.B. with attempted second-degree murder, a level 3, person felony, and during the commission of this crime a person was shot. Though the district court did not make findings regarding the second element of the factor, the element is the ultimate determination by the district court. To say the court found the offense required adult prosecution would render the remaining seven factors futile. It appears the court's focus on the first element of the factor shows the State had met its burden in showing the seriousness of the offense and the severity of the offense presented a concern of community protection. The court seemingly weighed this factor in favor of waiver. The district court's findings are supported by substantial evidence.

*Factor Four*

K.S.A. 2018 Supp. 38-2347(d)(4) considers the number of alleged offenses unadjudicated and pending against the juvenile.

The district court found "there could be less, there could be more. There are four in this case." The State asserts the district court's findings were based on substantial evidence. It seems V.B. interpreted the State's agreement as an interpretation that the factor weighed in favor of waiver. However, the State made no such assertion. As V.B. noted, it seems the court viewed this factor neutrally. However, under K.S.A. 2018 Supp. 38-2347(a)(1), the court must presume a juvenile to be a juvenile unless the State rebuts the presumption by a preponderance of the evidence. Therefore, although the court did not specify whether it held this factor to weigh in favor of adult or juvenile prosecution,

the State failed to rebut the presumption and so it should weigh in favor of V.B. being prosecuted as a juvenile.

*Factor Five*

K.S.A. 2018 Supp. 38-2347(d)(5) concerns the previous history of the juvenile, including whether the juvenile had been adjudicated a juvenile offender under this code or the Kansas Juvenile Justice Code and, if so, whether the offenses were against persons or property, and any other previous history of antisocial behavior or patterns of physical violence.

Regarding V.B.'s court history, the district court found, "There is some previous history as a juvenile which I believe are all misdemeanors. . . . It was a misdemeanor battery charge, misdemeanor theft, theft of a bicycle. There was a charge of a firearm theft. No prior felonies." The court held that if V.B. had been tried as an adult, he would have a criminal history score of H, putting him "on the lower end of the criminal history as far as [the] adult sentencing grid goes."

The State contends the district court provided insufficient attention to factor five. It appears the State is asking us to reevaluate and recharacterize the evidence such that it supports a waiver. However, the court did not disregard the evidence presented for factor five, rather, it placed more value on V.B.'s criminal history and possible criminal history score than the pattern of behaviors the State emphasized.

The State claims the district court minimized V.B.'s juvenile delinquent and CINC referrals. But the court took judicial notice of all prior cases. The State argued in closing that in 2015 and 2016 V.B. had been on probation for a total of 16 months and he had a history of antisocial behavior and physical violence, in support of waiver.

8

Contrary to the State's assertions, Brewer testified this factor supported EJJP. She explained V.B. had a total of eight prior referrals. Three of those were CINC referrals, and the remaining are all misdemeanor referrals. Brewer noted that V.B. had been on probation for misdemeanor battery through which he received limited services. She testified that the bulk of his probation was the requirement that he complete the Healthy Boundaries class, but after his probation had been extended he was ultimately released from probation as unsuccessful due to his failure to complete the class. She explained unsuccessful release means court services did not feel there were any further services that probation could offer to aid the client in successfully completing probation. She noted that during his time on probation V.B. was in middle school, he had issues with transportation, and he was not able to make it to classes and meetings with his probation officer. There was also a concern that he did not have a medical card and so could not attend the classes. She stated there were "issues beyond the control of him at that age."

Because the district court's factual findings were supported by substantial evidence, we would have to reweigh the evidence or recharacterize the facts to provide the State with the outcome it seeks. However, that is outside the authority of the appellate court.

*Factor Six*

K.S.A. 2018 Supp. 38-2347(d)(6) considers the sophistication or maturity of the juvenile as determined by consideration of the juvenile's home, environment, emotional attitude, pattern of living, or desire to be treated as an adult.

The district court found:

"In reviewing the Child in Need of Care petition, the facts alleged in that petition, . . . and
the testimony presented would indicate there is a challenging environment for [V.B.] to
grow up in. Talk about 22 DCF investigations concerning the family beginning in 1997

9

including allegations of neglect, lack of supervision, lack of medical attention, emotional issues, truancy, domestic violence, parental. It talks about encouraging unlawful behavior by the children, parents having weapons, delinquency, addictions, homelessness.

"[W]e have a psychological evaluation and the IEP which also indicates the challenges that [V.B.] has, and the education environment; and talking about some needs for some accommodations in regard to his learning environment; and Dr. Shimmel's report which talked about some of [V.B.'s] strengths including playing sports and being kind to people. Certainly whatever happened in this case, this incident was not a kind situation. That's Dr. Shimmel's comment. Dr. Shimmel did do some testing, standardized testing that resulted in some scoring and some comparative percentile rankings for [V.B.]. . . . Dr. Shimmel did have the opinion that . . . [V.B.] is not as mature as others of his age. Dr. Shimmel also believes that [V.B.] is in need of extensive academics, court services, and he would benefit from continued support of counseling. The testimony from Mr. Arthur indicated [V.B.] can improve, can learn, especially in a controlled environment. The evidence would show that there's been neglect in regard to [V.B.] in his home environment. The evidence really doesn't indicate a pattern of living or desire to be treated as an adult."

The State contends the district court's findings on the factor six were abbreviated. It claims this factor is inherently subjective but there is no basis for it to be based on comparison with others his age to determine maturity. The State claims the court's findings were not sufficient as some witnesses indicated V.B.'s maturity and intelligence were below average, while others testified he showed some independence and maturity. The State is essentially asking us to reweigh the evidence and reverse the court's determination of credibility of the witnesses, neither of which we can do. *D.D.M.*, 291 Kan. at 893.

Brewer testified factor six did not support a waiver. She testified that despite V.B.'s given age, he would turn 17 pretty quickly and his level of functioning was not necessarily that of a normal almost 17-year-old. She testified school records showed V.B. had an IEP for as long as he could remember, and he had challenges with learning. She

indicated the psychological evaluation showed he was in the lower percentiles for IQ and abilities. As far as his pattern of living or desire to be treated as an adult, she noted he had never had a driver's license, lived on his own, had a bank account, or had any means of supporting himself. She concluded: "I just think socially he's much younger than his given age."

Dr. Shimmel testified that V.B. potentially suffered from PTSD, although he did not see enough for a diagnosis. However, he had diagnosed V.B. with bereavement for the recent death of his mother and with intellectual disability. V.B.'s full scale IQ score was 67, placing him in the first percentile for his age range. The full scale score was based on four skills, and V.B. did not score higher than the fifth percentile in any of them. The assessment that measures personality suggested V.B. was a pleaser—a follower who wants to comply. The test reflected distressing emotions, attention, and some guardedness. Dr. Shimmel stated V.B. cognitively reflected feelings of inadequacy or a tendency to think he was not very capable. The third assessment, which provided insight into "how that person's doing, how they feel about themselves, their future," showed V.B. was stressed about his incarceration and regretful about being in jail. Some of V.B.'s answers reflected his difficulty with reading and school and a desire to learn more and do better. Dr. Shimmel concluded that

> "based on [V.B.'s] intellectual testing, his IQ scores that came up based on the descriptions of his struggles academically, even based on his aunt Tracy's description of some of his involvement with the law, it just seems to speak to somebody that didn't have the judgment, the decision-making of an average 16-year-old."

Shelby Coleman testified about V.B.'s level of sophistication and maturity, stating it was "below average of other 16 almost 17-year-olds that I work with on my case load if I'm comparing it to the current population that I work with." In reference to [V.B's] cognitive abilities, she stated:

11

"I feel that when I explain things to [V.B.], I generally explain them more than one time. So generally it's more than one way. Just because I want to make sure he's fully understanding what I'm saying to him because sometimes I get the impression based on this facial expression that he doesn't understand what I'm telling him. I understand that this whole system can be a little confusing so I try to get creative to explain things to him."

Jeff Goss was the only witness who testified that V.B. had demonstrated maturity in that "there's certain things like during devotion time you had a lot of youth that goofed off and didn't listen and you had to kind of tell, 'Hey, let's do the devotion then play basketball.' [V.B.] would sit, he'd listen. You know, he wasn't disrespectful."

Contrary to the State's assertion, the district court's findings were sufficient. Though the State contends there is no basis for determining this factor on comparison to others of V.B.'s age, the psychological tests provided comparative percentile rankings by age group. The comparison provides meaning to the numbers. It would make sense that, if the testing provides comparative analysis, the court should consider analysis by individuals who work with juveniles in V.B.'s age range to provide a gauge for their conclusions. The court clearly considered the different witnesses' testimony as well as V.B.'s family history with DCF as it referred to different sources of information in its findings. The State's suggestion that we reweigh the evidence, placing Goss' testimony above the other witnesses', is beyond our scope of review. The district court's findings were supported by substantial evidence.

*Factor Seven*

K.S.A. 2018 Supp. 38-2347(d)(7) considers whether there are facilities or programs available to the court which are likely to rehabilitate the juvenile prior to the expiration of the court's jurisdiction under this code.

12

Regarding the seventh factor, the district court found there were facilities and programs available in both the juvenile and adult setting. The programs available within the juvenile justice system were more appropriate for V.B. at that time and more likely to rehabilitate him as compared to programs in the adult system.

The State contends the district court's findings were particularly abbreviated and contends the evidence that the juvenile system would be more effective was "weak." However, the State attempts to shift the burden in making such an assertion. The court must have worked on the presumption that the juvenile system was more appropriate than the adult system. The State had the burden of rebutting the presumption and showing otherwise. K.S.A. 2018 Supp. 38-2347(a)(1). Yet, it provided no evidence to support the conclusion it asks us to adopt.

Contrary to the State's claim of weak evidence, Brewer—the State's witness—testified V.B. had "ample time available to him within the juvenile facility to complete programming which could include individual counseling, educational programming, aggression replacement training, Thinking for a Change, [and] more reformation therapy." She stated there were many services available to him within the juvenile correctional facility which she thought he could take advantage of. She stated that in the six months he had been at JDC, he had shown a willingness and ability to comply with things that were in his control. She stated the programs she believed would rehabilitate V.B. were custodial services.

Rex Arthur testified that V.B.'s behavior had greatly improved since he entered JDC. V.B. had worked and progressed in his reading abilities and with accepting help from others. Arthur expressed that V.B.'s better self-esteem should help him be more assertive in standing up for himself instead of falling into the negativity of others. He

13

stated V.B. responded very well to the structure at JDC such that he had received the ACE award three or four times.

The State contends the testimony about the programs and facilities likely to rehabilitate V.B. are meaningless when considering his unsuccessful release from probation when he had very little required of him at the time. However, the district court gave more weight to the programs and facilities than to his previous failure to complete a class. As Brewer testified, at the time of V.B.'s previous probation, he was in middle school and could not make it to appointments or class because he had no access to transportation or his medical card. The district court also considered V.B.'s positive response to the structured environment in making its determination regarding this factor. The court's findings were not abbreviated and were supported by substantial evidence.

*Factor Eight*

K.S.A. 2018 Supp. 38-2347(d)(8) considers whether the interests of the juvenile or of the community would be better served by criminal prosecution or extended jurisdiction juvenile prosecution

The district court found:

"Criminal prosecution would extend juvenile jurisdiction. The community's interest would be that—I guess there's a couple different ways you can look at it. One is you try to take [V.B.] and put him in a place where community can't be affected for a certain period of time; and then, eventually he would get out; and then, how we determine if the community is safer or less safe at that point; and plus the fact he was incarcerated a certain number of years and couldn't hurt anybody, and then released, and what—to what extent is he rehabilitated, and is he a danger to the community then or not? Is juvenile justice going to do a better job of helping [V.B.] be the best person he can be, but that will be an earlier date. And then he's released, and so, the community was safe while he

14

was incarcerated; and then, how is the community affected once he's released? Difficult—difficult to know. Experts say it's 25 when the adult brain is fully developed.

"... I do find that having considered all these factors that the community in the long run, and hopefully in the short run too, and for [V.B.] in both the short and long run, to continue to treat him as a juvenile in the juvenile system."

The State contends the district court's findings are abbreviated and more speculative than supported. It asserts the court proposed questions about V.B.'s and the community's best interests in length of incarceration and likelihood of rehabilitation without resolving the apparent conflict. The State claims that in making its findings, the court failed to appreciate the impact a lengthier sentence would have on the safety of the community.

V.B. asserts the district court's statements were merely its expression of the factors it weighed in determining what was in the best interests of V.B. and the community. The court had to choose between a lengthier sentence during which the community was safe from V.B., but with little confidence in rehabilitation, or a shorter sentence during which V.B. would have a greater likelihood of rehabilitation, providing a greater chance of community safety after his release. In making the above statements, the court was being candid in its evaluation. Ultimately, the court expressed its determination that in the long- and short-term, both the community's and V.B.'s interests were better served with juvenile prosecution.

The State takes issue with the district court's statement that the brain is not fully developed until age 25 because it indicates the court does not believe juveniles should ever be waived to adult status and it was not supported by the record. However, the presumption is that juveniles should not be prosecuted as adults and so the court's starting point should reflect that. Absent a showing that the court regularly abuses its discretion by denying waiver, the appearance of being against waiver is of no consequence. Further,

the statement about brain development is common knowledge, and so, the district court did not make any extrajudicial fact-finding.

The district court's findings are in line with its previous findings that the juvenile system offers a better chance of rehabilitation and are supported by substantial evidence. The speculation by the court was merely it openly discussing the factors it weighed in making the determination. The court's determination that the community and V.B. were better served by juvenile prosecution showed its emphasis on short- and long-term safety through rehabilitation.

The district court's findings of fact with regard to all eight of the factors listed in K.S.A. 2018 Supp. 38-2347(d) are based on substantial competent evidence.

*Legal Conclusion*

Finally, the State argues the district court's legal conclusion is an abuse of discretion as it was based on an error of law and it was an unreasonable interpretation of the statute. The State makes the same arguments for the factual errors as above. As discussed above, the district court's factual findings were supported by substantial competent evidence. Again, the State is essentially asking us to reweigh the evidence and recharacterize the facts in a way that supports waiver. However, that is outside the scope of our review.

Following its K.S.A. 2018 Supp. 38-2347(d) analysis, the district court concluded:

"I find that the State has not established by a preponderance of the evidence that the community would be safer if we went to criminal prosecution. There's lots of services in the juvenile system that have not been—that are available and have not been tried yet for [V.B.]. There—hasn't shown a desire to be treated as an adult. I guess at times he's out

16

there acting like an adult. That seems more like his life circumstances than his preference or his desire. I know these doctors like Dr. Shimmel thinks if you work hard you can catch up to others of your age. I guess some of them; and there are programs that can help you do that in the juvenile justice system as opposed to sending a young man with this personal intellectual system in the adult system. I think he's going to have even more challenges while he's dealing with that and after he's released."

Though the court did not specify in its findings whether each factor weighed in favor of waiver or EJJP, the court summed up the evidence it gave the greatest weight in the paragraph above.

Under K.S.A. 2018 Supp. 38-2347(a)(1), a juvenile is presumed to be treated as a juvenile unless the State proves otherwise. The district court properly began with such a presumption, and the witnesses' testimony strengthened the presumption. The court's findings of fact were supported by substantial competent evidence and sufficiently provided how it evaluated and characterized the evidence to reach its conclusion. The court's conclusion aligned with its factual findings and was a reasonable interpretation of the law. The district court did not abuse its discretion.

Affirmed.

17